(No. 64252.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JUAN CABALLERO, Appellant.

*Opinion filed January 18, 1989.*

252

254

CALVO, J., took no part.
MILLER, J., joined by MORAN, C.J., specially concurring.
RYAN, J., concurring in part and dissenting in part.

Alan Raphael, with Pat Barnett and Leslie Khoshaba, law students, all of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Kenneth T. McCurry, Kevin Sweeney, Michael J. Kelly and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

This case involves the petition of the defendant, Juan Caballero, under the Post-Conviction Hearing Act (Ill.

Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*), challenging his convictions and sentences. Together with a codefendant, Luis Ruiz, the defendant was charged by an information filed in the circuit court of Cook County with the murders of three teenage males, Michael Salcido, Arthur Salcido, and Frank Mussa. Charges of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2) and unlawful restraint (Ill. Rev. Stat. 1979, ch. 38, par. 10—3(a)) regarding each victim were also filed against the defendants. The two cases were then severed, and the two defendants tried before a single judge supervising two separate juries. Both defendants were convicted on all counts. Separate sentencing hearings were then held for the two defendants. The jury found that there existed one or more of the statutory aggravating factors (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(d), (g)) and that there were no mitigating factors sufficient to preclude the imposition of death. Thereafter the defendant was sentenced to death, as was Ruiz. On direct appeal we affirmed the defendant's convictions and death sentence. (*People v. Caballero* (1984), 102 Ill. 2d 23.) In a separate appeal, Ruiz' convictions and sentence were also affirmed. (*People v. Ruiz* (1982), 94 Ill. 2d 245.) The defendant's subsequent petition for post-conviction relief was dismissed without an evidentiary hearing in the circuit court of Cook County, and this appeal followed (107 Ill. 2d R. 651).

The facts of this case are adequately set forth in our opinion on the defendant's direct appeal and will be repeated here only where necessary. The defendant raises a number of claims concerning the fairness of his conviction and his sentence. The standard for the evaluation of these claims is clear. A Post-Conviction Hearing Act proceeding is not an appeal *per se*, but a collateral attack on a judgment. (*People v. James* (1986), 111 Ill. 2d 283, 290.) In order to prevail under the Act, the defendant

must establish a substantial deprivation of his rights under the United States Constitution or the Constitution of Illinois. (*People v. Griffin* (1985), 109 Ill. 2d 293, 303.) The defendant is not entitled to an evidentiary hearing unless the allegations of his petition, supported where appropriate by the trial record or by accompanying affidavits, make a substantial showing that the defendant's rights have been so violated. (*People v. Gaines* (1984), 105 Ill. 2d 79, 91-92.) For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are to be taken as true. (*People v. Cihlar* (1984), 125 Ill. App. 3d 204, 208, *aff'd* (1986), 111 Ill. 2d 212; see also *People v. Reeves* (1952), 412 Ill. 555, 559.) For the sake of clarity, we consider the defendant's challenges to his convictions and his sentence under separate headings.

## THE CONVICTIONS

The vast majority of the defendant's challenges to his convictions concern his counsel's performance at trial. The defendant claims that defense counsel erred by: (1) assuming a "belligerent and argumentative attitude" toward the court, (2) antagonizing the jury in his opening statement, (3) failing to present his strongest witnesses or evidence first, (4) inadequately cross-examining prosecution witnesses, (5) presenting a weak and incoherent closing argument, (6) failing to move for a directed verdict at the close of the State's case, and (7) failing to "life-qualify" the jury during *voir dire.* None of these contentions, in our opinion, serves to establish that the defendant was deprived of his constitutional right to the effective assistance of counsel at trial.

The general standard for determining whether a defendant has received effective assistance of counsel at trial or at a death penalty hearing has two components: deficiency and prejudice. The defendant must prove: (1)

that his counsel made errors so serious, and his performance was so deficient, that he was not functioning as the "counsel" guaranteed the defendant by the sixth amendment to the United States Constitution, and (2) that these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The standard for assessing claimed deficiencies in an attorney's performance is that of "reasonably effective assistance" which is within the range of "competence demanded of attorneys in criminal cases." The standard is one of objective reasonableness, under "prevailing professional norms." (466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65.) To establish a deficiency, the defendant must overcome the strong presumption that the challenged action or lack of action might be the product of " 'sound trial strategy.' " 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

Even assuming a deficiency, the defendant must still demonstrate prejudice. Under *Strickland*, a defendant who demonstrates that his counsel's trial performance fell below prevailing professional norms must also show that there is a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) As the Supreme Court noted in *Strickland*, claims of ineffectiveness can often be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding whether the errors were serious enough to constitute less than reasonably effective assistance. (466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) As is the case with many other defendants who make similar claims, the defendant, in his argument, has attempted to reverse this procedure. He dwells heavily on the alleged

deficiencies in trial counsel's performance but makes little attempt to demonstrate to a reasonable probability that, absent these deficiencies, the jury would have entertained a reasonable doubt as to the defendant's guilt. Since most of the claimed errors concerned relatively trivial matters, and since the evidence of the defendant's guilt was substantial if not overwhelming, the defendant was not prejudiced by any of the errors alleged.

It must be remembered that the defendant gave a detailed confession of his guilt, which was admitted at trial. In this confession he told how he, together with three companions, abducted the three victims, who had claimed to know members of a rival street gang. In the confession he admitted that he personally stabbed and cut the throat of one of the victims. Extensive physical and forensic evidence corroborated many of the details of the confession. The prosecution also introduced evidence that the defendant had made a less specific admission of guilt to a cell mate.

The defendant testified in his own behalf, repudiating his confession and asserting that it was extracted from him by force. He also presented the testimony of his mother and of two other, less important witnesses. Throughout the trial his counsel attempted to show that the confession was involuntary.

It is against this factual background that most of the defendant's claims of ineffective assistance must be judged. In most cases the defendant has not even argued, much less demonstrated, a reasonable probability that the jury would have found the defendant not guilty had his counsel acted as the defendant now wishes that he had. For example, the defendant maintains that trial counsel's "belligerent and argumentative" attitude towards the trial judge may have alienated the jury. Since all but one of the incidents of "belligerence" occurred outside the presence of the jury, it is difficult to under-

stand how they could have affected, let alone changed, the jury's verdict. But in any event the allegation that the jury would have found the defendant not guilty if the relationship between defense counsel and the trial judge had been more amicable does not ring true.

It is undeniable that matters of presentation and style may have some subliminal effect on a jury. But we must normally presume that a jury has been persuaded by the strength of the evidence and not by the eloquence of counsel. Unless counsel's demeanor falls vastly below professional standards, and unless we can say to a reasonable probability that this deficiency caused a jury which would have acquitted to convict, we cannot and should not reverse. Besides, it is difficult to determine prevailing professional norms on matters which are so inherently subjective. One man's belligerent argumentativeness is another man's vigorous advocacy.

These same considerations apply to most of the remainder of the defendant's claims. We cannot say, to a reasonable probability, that the jury would have acquitted the defendant if defense counsel had not said to the jury in his opening that:

> "if you can[not] consider it in your mind the possibility that a youngster can be so treated in a police station of America, in the State of Illinois and County of Cook, in Chicago in the police station at Western and Belmont, then you might as well get up from here and find Juan Caballero guilty now."

Taken in context, this statement was a rhetorical device. It emphasized to the jury the importance of keeping an open mind on the question of whether the defendant had been beaten so as to make him confess. Even assuming, as the defendant now maintains, that the jury took this statement as an insult, we cannot say to a reasonable probability that they would have acquitted in the absence of this "insult." Similarly, we cannot say to a reasonable

probability that the jury would have acquitted had they heard the defendant's testimony first, rather than after two other rather ineffectual witnesses. We must assume that the jury was capable of assessing the defendant's credibility without reference to the strength of the remainder of the defense case. It is difficult to believe, as the defendant claims, that the jury lost interest in the defense case and failed to pay attention to the defendant's testimony simply because the defendant presented some weaker witnesses first.

We are also uncertain, and the defendant's brief does not inform us, how the defendant was prejudiced by certain deficiencies in defense counsel's cross-examination of the State's witnesses. While the defendant claims that this cross-examination was "long, confusing, and harmful to the defendant," he fails to specify with any precision what a shorter, clearer, and more helpful cross-examination would have accomplished. The general claim that the cross-examination "served neither to elicit favorable testimony nor to impeach the State's witnesses" is meaningless without some statement of what favorable testimony could have been elicited or how the State's witnesses could have been impeached.

The only specific instance of "harmful" cross-examination cited by the defendant involves a witness who found a knife, allegedly the murder weapon, in a snowbank. On cross-examination counsel for Ruiz asked the witness whether he had cleaned the knife or had seen any blood on it. The witness replied that he had not. Counsel for the defendant then cross-examined the witness at some length, establishing that the witness "may have" wiped off the blade of the knife, but probably did not wipe the handle.

So far as we can understand the defendant's argument, he is asserting that the testimony elicited by his counsel's cross-examination was less favorable because it

tended to provide a nonexculpatory explanation for the absence of blood on the knife. It may be that in this respect the examination slightly strengthened the State's case. However, even this tentative conclusion is subject to some doubt: the contradictions and hesitation the witness displayed under defense counsel's cross-examination might well have damaged his credibility. But the issue was in any case of small importance. The State maintained that the blood was washed off in the snowbank; counsel for the defendant argued in summation that the absence of blood on the *handle* of the knife (which had been sticking out of the snowbank) did not jibe with the extremely violent character of the crimes. Whether the witness had or had not cleaned the blade of the knife did not greatly matter.

We are also unpersuaded by the defendant's claim that he was prejudiced by his counsel's closing argument. The defendant claims that his counsel unnecessarily emphasized the horror of the crime, spent too much time presenting the prosecution's case, did not focus on the crucial issues, and failed to mention the State's burden of proving the defendant guilty beyond a reasonable doubt.

We have carefully read the defense counsel's closing argument. While it is not a model of clarity or conciseness, neither is it an "abdication" of the defendant's position, as the defendant now suggests. In fact, most of the defendant's criticisms of it are based on isolated passages, unfairly extracted from their context. Defense counsel's references to the horrible nature of the crimes, for example, occurred in three contexts. Defense counsel first argued that the jury should not let the gruesome nature of the victims' injuries divert them from their duty to dispassionately decide whether or not the defendant was guilty. Second, defense counsel argued that given the number and severity of the stab wounds

suffered by one of the victims, the statement in the defendant's confession that this victim had begged for mercy after being stabbed many times was absurd. Third, defense counsel argued that given all the bloodshed, and the great effort that would have been required had the perpetrators attempted to clean the entire car, the absence of the defendant's fingerprints anywhere on the car was evidence of his innocence.

Similarly, the allegation that defense counsel spent too much time presenting the prosecution case is without merit. More specifically, the charge that defense counsel devoted one fourth of his summation to a mere recitation of the defendant's confession is a serious distortion of the record. In fact, while defense counsel did read from the confession, he punctuated his reading with trenchant attacks upon its reliability. He argued, for example, that the defendant, a "street kid," was unlikely to have used police jargon such as the phrase "multiple stab wounds." He argued that a passage in the confession which suggested that one of the victims lay passively in the snow instead of trying to escape conflicted with the "defense wounds" that had been found on the victim's hands. He argued that no one was likely to remember such details as the exact position of the bodies one week after the crime. He argued, in short, that the statement was fabricated by the police and was not the defendant's voluntary confession.

Nor do we agree entirely with the allegation that the summation was confused, poorly organized, and lacking a focus on the crucial issues. That there is some merit to this contention is obvious from some of the passages quoted by the defendant. (One example is the statement: "I'm going to start this where I finish, I'm going to finish this and start it where I finish and vice versa.") We also agree that the passage in defense counsel's summation that dealt with a relatively minor witness, Nicholas

Roggy, was not terribly convincing. Even as to that passage, however, defendant has not stated accurately the full context: defense counsel used an admittedly minor inconsistency in the witness' testimony to argue generally that the jurors should be skeptical of the State's case. The remaining instances of confusion and disorganization, while real, are typical of those often found in any speech which the speaker has not memorized word for word. But the more serious charge, that the summation neglected issues important to the defendant, is simply unfounded. Defense counsel devoted most of his summation to a detailed attack on the State's case, including the physical evidence and the defendant's confession. These were the key issues. The defendant has not specified which other issues defense counsel should have, but did not, address.

The last charge against defense counsel's summation is that he failed to mention the State's burden of proving the defendant guilty beyond a reasonable doubt, thereby losing a "powerful psychological tool." Even assuming that it is incompetent in all instances for defense counsel to fail to emphasize the weight of the prosecution's burden, this charge is also not well-founded. While defense counsel neglected to mention the words "reasonable doubt," he did stress both "the presumption of innocence," and that the "State has the burden of proof." We cannot say to a reasonable probability that the jury, which was adequately instructed as to the State's burden, would have acquitted the defendant if defense counsel had used the words "reasonable doubt."

The cases of *People v. Hattery* (1985), 109 Ill. 2d 449, *People v. Redmond* (1972), 50 Ill. 2d 313, and *People v. De Simone* (1956), 9 Ill. 2d 522, all cited by the defendant, are distinguishable. In each case, defense counsel abdicated his responsibility by directly admitting the defendant's guilt. In *Redmond*, for example, defense

counsel said: "Well, am I selling someone the defendant's guilt? I think so. Guilty, yes. Sure, guilty." (*Redmond*, 50 Ill. 2d at 316.) In *De Simone*, similarly:

> "[defense counsel's] closing remarks *** wandered to many irrelevant and confusing matters and, to a greater extent than seems reasonable, were used to suggest to the jury that defense counsel were overmatched by the prosecutors, that they were not capable of defending a criminal case, that their clients were guilty, and that there was, in fact no legal defense which could be made for defendants." *De Simone*, 9 Ill. 2d at 530.

In *Hattery*, defense counsel averred in his own opening statement:

> " 'We are not asking you to find Charles Hattery not guilty. At the end of your deliberations, you will find him guilty of murder. We are asking you to consider the evidence that you hear today and in the next few days to explain why he did the horrible thing that he did. Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you, will be whether to impose the death penalty on Charles Hattery for trying to save the life of his family.' " (*Hattery*, 109 Ill. 2d at 458-59.)

It is true that in cases like *Hattery*, *Redmond* and *De Simone*, where counsel abandons even the pretense of defending his client, Federal constitutional standards or our own State Constitution may mandate reversal even in the absence of prejudice. It may be argued in such cases that counsel's effectiveness has fallen to such a low level as to amount not merely to incompetence, but to "no representation at all." (See *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (stating that prejudice will be presumed where counsel is entirely absent or where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"); *Hattery*, 109 Ill. 2d at 464-65 (reversing even though evidence of defendant's guilt

was "overwhelming"); *De Simone*, 9 Ill. 2d at 531 (reversal mandated even where prosecution case is "conclusive," but representation "is of such low caliber as to amount to no representation at all").) In this case, however, counsel, far from conceding his client's guilt, vigorously argued in favor of his innocence. He urged the jury that if they did their duty and took a "look at the facts of this case, you will find Juan Caballero not guilty as charged." He stated that the defendant knew nothing about the murder scene because "he was not there." At another point, he said to the jury: "I tell you this man did not commit this crime and he was hooked up in it [*i.e.*, 'framed,' or 'set up']." Defense counsel cannot accurately be accused of throwing in the towel.

We also find no merit to the contention that the outcome would have been different had defense counsel moved for a directed verdict at the close of the State's case. The defendant has not even attempted to demonstrate that the State's case was legally insufficient. We are therefore unable to understand how the outcome would have been changed had defense counsel made this motion. In this connection it is significant that at no time has the defendant ever challenged the legal sufficiency of the State's case, either on his direct appeal or in his motion for post-conviction relief.

The last of the defendant's charges of incompetence at trial concerns his counsel's failure to "life-qualify" the jury. In other words, the defendant argues that his counsel should have queried the jurors to determine if any one of them would automatically sentence to death any defendant found guilty of murder. (See *People v. Ramirez* (1983), 98 Ill. 2d 439, 459-60.) This argument, although grouped together with other challenges to his conviction, is, in fact, properly classed as a challenge to the defendant's sentence. The defendant does not argue that a jury which has not been "life-qualified" is more

inclined to convict, but only that the failure to life-qualify the jury deprived defense counsel of the opportunity to make a "meaningful appeal for a life sentence." Because of our resolution of the defendant's challenge to his sentence, this contention need not be considered.

In short, we do not believe that the defense counsel's performance at trial mandates the reversal of the defendant's conviction. And although we have considered each alleged error individually, we do not think that any different result would follow from considering their cumulative impact.

The defendant next raises a series of claims relating to the conduct of his counsel upon his direct appeal. He contends that his counsel on his direct appeal was incompetent because he: (1) briefed many frivolous and inconsequential issues instead of other, more meritorious ones, (2) failed to assert incompetence of trial counsel, and (3) failed to raise the issue of prosecutorial misconduct.

The Supreme Court of the United States has only recently determined that a defendant is entitled to the effective assistance of counsel upon direct appeals which are allowed as a matter of right. (*Evitts v. Lucey* (1985), 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37.) In *Evitts* itself, however, the Supreme Court did not address the issue of what standards are to be used for assessing the competence of counsel upon a direct appeal. In an analogous context, involving the failure to comply with a jurisdictional prerequisite to an appeal, this court held that competence was to be assessed using the two-part *Strickland* standard: a failure to adhere to an objective standard of professionalism, and, as a result of that failure, a reasonable probability that the outcome of the proceeding would have been different. (*People v. Wilk* (1988), 124 Ill. 2d 93.) While *Wilk* involved the failure to comply with a jurisdictional prerequisite, we believe that the same standard applies *a*

*fortiori* to a claim that an appellate advocate chose the wrong issues or argued them ineffectively. Where the defendant maintains, for example, that his appellate attorney failed to argue a particular issue, he must show the failure to raise that issue was objectively unreasonable, as well as a reasonable probability that, but for this failure, his sentence or conviction would have been reversed.

The defendant first claims that his trial counsel was ineffective because he raised a number of issues which lacked merit. Obviously this claim would have no meaning unless appellate counsel could have raised other, stronger issues in their place. No one's sentence or conviction will be reversed merely because counsel omits frivolous issues; reversal requires that the defendant raise some meritorious issue instead. Therefore, the claim that the defendant's weak arguments somehow "diluted" his stronger ones is without merit.

We note parenthetically that the issues actually chosen were not so hopeless as the defendant makes out. The inclusion of 11 different challenges to the facial validity of the Illinois death penalty statute was not an exercise in futility. Not all of these different challenges had been rejected at the time of the defendant's direct appeal. Three justices of this court as it was constituted when the issue was first raised, and a fourth justice elected thereafter, had all voted to hold the law unconstitutional. Several Federal district judges have expressed grave doubts about the law's constitutionality. Until the issue is finally settled by the United States Supreme Court, it is not unreasonable for defendants to keep raising it, if for no other reason than to preserve it for review upon *habeas*. Thus the contention that appellate counsel was somehow ineffective merely because he chose to present these issues is not valid.

Nor do we see any more validity to the defendant's claim that the other six issues raised were frivolous. While there is no need to discuss these issues in detail, it should be noted that one issue, the claim that the trial court erred by admitting the defendant's confession, was carefully considered on direct appeal. One subissue, the scope of evidence which might be considered on a motion to suppress, was discussed in considerable detail; and the opinion overruled or repudiated several appellate court cases which supported the defendant's position. *Caballero*, 102 Ill. 2d at 33-37.

Neither of the two issues which the defendant claims should have been raised on appeal, incompetence of counsel and prosecutorial misconduct during summation, would have mandated reversal had they been properly raised. We have stated above why the contention of incompetence during the guilt phase lacked merit; it follows that the failure to raise the issue on direct appeal also would not have resulted in reversal. As to the issue of prosecutorial misconduct, in order to determine whether failure to raise it on appeal was incompetent it is necessary to assess its merits. Since the defendant also raises the issue of prosecutorial misconduct as a separate substantive reason for reversal, the discussion of these two points can be profitably combined.

There is no question that the prosecutor made many improper remarks during his summation. Where a prosecutor's statements in summation are not relevant to the defendant's guilt or innocence and can only serve to inflame the jury, the statements constitute error. (*People v. Tiller* (1982), 94 Ill. 2d 303, 321; *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) It was therefore improper for the prosecution to argue in summation that the defendant was an "animal," and that an acquittal would "turn the streets over to the punks, and the animals and people like him." (See *Tiller*, 94 Ill. 2d at 320-21 (disapprov-

ing prosecutor's characterization of defendant as an animal and his comparison of the crime to the Nazi holocaust).) And while a prosecutor may state his opinion that the defendant is lying (*People v. Weathers* (1975), 62 Ill. 2d 114, 120) if that statement is based on the evidence, he may not give his own opinion as to the guilt or innocence of the accused unless the prosecutor states, or it is apparent, that the opinion is solely based on the evidence. (*People v. Monroe* (1977), 66 Ill. 2d 317, 324.) Therefore the prosecutor's statements that "I didn't go to law school for four years at night to put innocent men in the penitentiary" and that "[t]his man is guilty" were erroneous because they tended to put the prosecutor's own credibility into issue. Similarly, a prosecutor should not impeach the integrity of defense counsel. (*Monroe*, 66 Ill. 2d at 324.) The prosecutor's statement that defense counsel's argument was "a bunch of double talk, a bunch of nonsense," verged on the improper. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 497-98.) On the other hand, the statement that "he's trying to play you for fools and he's making a mockery of the system," when read in context, was a reference to the defendant's testimony, and not to defense counsel. However, the prosecutor's statements that "Mrs. Mussa will never see her son" and "Mrs. Salcido will not see her two sons, think about that right," were more than incidental references to the victim's families: they verged upon the kind of detailed discussion of the deceased victim's families which we have previously condemned. *People v. Bernette* (1964), 30 Ill. 2d 359, 371; see also *People v. Holman* (1984), 103 Ill. 2d 133, 166-67.

We agree with the State that the prejudicial effect of some, if not all, of these remarks is lessened by the circumstance that they were stated in rebuttal to comments made by defense counsel. For example, although the "four years of law school at night" remark was im-

proper even as rebuttal, it was provoked in part by defense counsel's argument that the defendant had been "framed." More importantly, however, the defendant has not even attempted to argue, based on the evidence in the case, that these errors warrant reversal. "[I]mproper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused." (*People v. Baptist* (1979), 76 Ill. 2d 19, 29; see also *People v. Tiller* (1982), 94 Ill. 2d 303, 321.) Nowhere in the defendant's brief has he contested the State's contention that the evidence of his guilt was overwhelming. We agree with the State that the defendant's confession and admission, combined with the physical evidence, constituted very significant proof of his guilt. Under these circumstances, and particularly given the fact that most of these remarks were not challenged either at trial or upon direct appeal, we do not believe that they warrant reversal of the defendant's conviction. For the same reason, we cannot agree that the failure to challenge them at trial or on direct appeal represents attorney ineffectiveness so serious as to warrant reversal under *Strickland*.

For the foregoing reasons, that portion of the circuit court's judgment which dismissed the defendant's post-conviction petition for reversal of his conviction and an evidentiary hearing on his conviction is affirmed.

## THE SENTENCE

While the defendant raises several different challenges to his sentence, one stands out from the others. That is the claim that his attorney failed to introduce the mitigating testimony of several potential witnesses solely because they were not categorically opposed to the death penalty in all situations. Allied to this claim is the contention that his attorney failed to contact or investigate other mitigation witnesses who were suggested by the

defendant's family, and who could have attested to mitigating circumstances of the defendant's background and character. These claims are based upon affidavits and evidence not in the original record, and the State does not argue that they have been waived or are *res judicata*. We agree with the defendant that this circumstance, if true, alleges a substantial violation of the defendant's constitutional rights sufficient to require an evidentiary hearing.

The standard for assessing whether an attorney's performance at a capital sentencing hearing was constitutionally deficient is that set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. As applied to death sentencing hearings, the *Strickland* standard requires the defendant to show: (1) that his attorney's performance at the hearing did not constitute reasonably effective assistance, judged by "prevailing professional norms" (466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65), and (2) there is a "reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating factors did not warrant death" (466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069). At death penalty hearings, decisions not to present mitigating evidence will not be deemed incompetent if they stem from a theory of defense which does not require the use of mitigating evidence (466 U.S. at 699, 80 L. Ed. 2d at 700-01, 104 S. Ct. at 2070 (reliance upon extreme emotional distress as a mitigating circumstance)), or from a theory which might be adversely affected by the use of such evidence (*Burger v. Kemp* (1987), 483 U.S. ___, ___, 97 L. Ed. 2d 638, 656-57, 107 S. Ct. 3114, 3125-26).

We have previously held that a competent attorney may decide, in an appropriate case, to forgo presenting

mitigating evidence and, instead, attack the morality of capital punishment or plead for mercy. (See *People v. Gaines* (1984), 105 Ill. 2d 79, 95; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 69-70.) In both these cases our conclusion flowed in part from the failure of post-conviction counsel to show by affidavit the mitigating evidence which could have been presented. But it may be in some cases that the available mitigating evidence is either so flawed or potentially damaging that a competent counsel may reasonably decide not to present it. In other cases, counsel may decide that some potentially mitigating evidence would be merely cumulative. In others, it may be reasonable to rely on mitigating evidence which has already come to the jury's attention during the guilt phase. (*People v. Gacy* (1988), 125 Ill. 2d 117.) It is also not unreasonable for counsel to pursue different strategies; to combine the use of mitigating evidence with attacks on the death penalty and requests for mercy. In all cases where the drawbacks of potentially mitigating evidence are obvious from the record, we must presume that it was these drawbacks, and not merely lack of diligence, which was behind counsel's decision.

In this case, however, any such presumption is belied by the affidavits presented. According to these affidavits, defense counsel waited until after the defendant had been convicted to investigate possible evidence in mitigation. The defendant's family then suggested the names of a number of people who might testify on the defendant's behalf, including several employees of an organization called Inner City Impact (ICI). On the weekend between the end of the guilt phase and the start of the death penalty hearing, defense counsel met with a number of these potential witnesses for one hour.

We agree with the State that a number of the witnesses who the family suggested could have testified in the defendant's behalf might well have been rejected for

reasons of defense strategy. The State argues that defense counsel selected from the potential witnesses only those who were adults, had known the defendant for a considerable period of time, and were not familiar with the defendant's recent participation in "gang" activities. In this way defense counsel may have hoped to preclude the prosecution from eliciting damaging testimony about the defendant's participation in the gangs. Thus the testimony of three young men from the neighborhood who had played basketball with the defendant might well have been rejected because they could have testified, as two of them affirmed in their affidavit, that the defendant had joined the Latin Kings gang. Similarly, the decision not to call the defendant's two brothers might well have stemmed from the fact that both of them, as is apparent from the defendant's own affidavits, were members of the Latin Kings.

In line with this strategy, counsel's decision to call the three mitigating witnesses he did call, two neighbors of the defendant and one of the defendant's eighth grade teachers, was not presumptively unreasonable. Their testimony established that the defendant was cooperative, athletic, quiet, polite, well-disciplined, and, at one point, a "model student." Since all of these witnesses knew the defendant long before he joined the Latin Kings, none could have been cross-examined about his gang involvement.

It would therefore have been reasonable for defense counsel to decline also to call the various employees of Inner City Impact on the ground that most of them could also have testified that the defendant had dropped out of Inner City Impact to join the Latin Kings. However, this assumption is belied by affidavits in the record. William Dillon, the executive director of ICI, and Grace Constable, an employee of ICI, both state in their affidavits that they met with defense counsel at the one-

hour meeting and offered to testify on the defendant's behalf. According to both of their affidavits, defense counsel refused their offer on the ground that they were not opposed to the death penalty in all situations. Similarly, defense counsel rejected the testimony of the Reverend Douglas Moore, who had visited the defendant while he was in jail, because Moore was not opposed to the death penalty in all situations.

We are unable to understand how these witnesses' support of the death penalty would have damaged their credibility. First, it is by no means clear that a mitigation witness' opinion of the death penalty is relevant at a death penalty hearing. A death penalty hearing is not a referendum on the wisdom of the death penalty. Second, even assuming such a view would be relevant, a witness' support for the death penalty could help rather than hurt the defendant. A mitigation witness who opposed the death penalty in all situations would be less credible than a witness who supported it in some situations, but nevertheless did not believe the defendant was deserving of death. The State speculates that a witness who did not oppose the death penalty in all situations could be forced under cross-examination to admit that the defendant should be put to death. This speculation is rather farfetched.

In short, the statements in the affidavits which allege that defense counsel rejected some of the mitigation witnesses because they did not oppose the death penalty raise a serious question as to counsel's competence; they also call into question whether he actually chose not to use some of the other mitigation witnesses on account of a reasoned decision to try to downplay the defendant's membership in the Latin Kings.

It is true that, judging by the record, defense counsel hoped to persuade the jury that the death penalty was

wrong under any circumstances. In his opening statement to the jury, he said:

"Ladies and Gentlemen, by now you understand that I represent Juan Caballero. The State has stated to you that they will present evidence to you that will enable you to consider the imposition of death upon Juan Caballero. I suggest to you and I state emphatically that these State's Attorneys and no man living can present enough evidence to you for you to come back and sentence a fellow human being to death. It's not your responsibility—it's God's."

Moreover, in his closing argument, defense counsel returned to the same theme. In an extraordinarily moving speech, he attacked the morality of the death penalty and pleaded for the defendant's life. However, defense counsel obviously also sought to persuade the jury that the defendant was not deserving of death. No other purpose could have been served by putting on the three mitigation witnesses. Defense counsel's summation also included a short passage in which he argued, based on the testimony of the mitigation witnesses, that the defendant had once been an "average, normal young person" whose participation in the murders was an aberration. It cannot be argued, therefore, that defense counsel purposely chose to forgo all attempts at mitigation in favor of a general attack upon the death penalty.

Our conclusion is buttressed by the fact that counsel waited until after the defendant's conviction to investigate possible evidence in mitigation and apparently confined his inquiry to a one-hour group interview with the witnesses suggested by the defendant's family. This alleged behavior is similar to that addressed in several other cases where courts have determined either that the failure to present mitigating evidence fell below professional standards, or, more pertinently, that similar allegations were sufficient to mandate an evidentiary hear-

ing. See *Johnson v. Kemp* (S.D. Ga. 1985), 615 F. Supp. 355 (counsel undertook no investigation of possible mitigation aside from speaking to defendant and defendant's parents), *aff'd* (1986), 781 F.2d 1482; *Pickens v. Lockhart* (8th Cir. 1983), 714 F.2d 1455 (counsel failed to present or investigate possible mitigating evidence, including the defendant's troubled childhood and family background); *Tyler v. Kemp* (11th Cir. 1985), 755 F.2d 741 (counsel talked briefly with family members but did not explain to them that they could testify as to mitigation rather than guilt or innocence).

For the foregoing reasons, we conclude that the affidavits sufficiently allege a departure from professional norms which cannot be attributed to a reasonable trial strategy. The next question, and the more difficult one, is whether, absent this departure, there is a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating factors did not warrant death.

The statutory aggravating factor relied upon by the State was that the defendant had been convicted of three murders. In addition, the State proved that the defendant had previously been arrested and convicted of the possession of a gun. The State also argued that the cold-blooded and brutal nature of the killings, combined with the defendant's failure to express remorse, constituted additional nonstatutory aggravation. We agree with the State that the weight of the nonstatutory aggravation was not inconsiderable.

On the other hand, the aggravating factors were perhaps not so great as those in other cases where we have determined that the failure to call mitigation witnesses was not incompetent. In *People v. Kubat* (1986), 114 Ill. 2d 424, 436, where we affirmed the denial of the defendant's petition after an evidentiary hearing, we concluded that the possible mitigation would have been unavailing

in the light of the defendant's long career of violent criminality. In *People v. Gaines* (1984), 105 Ill. 2d 79, also affirmed after an evidentiary hearing, the State presented a great deal of aggravating evidence concerning the defendant's violent and criminal behavior both before and after the murders for which he was convicted.

Against the aggravating factors in this case must be placed the defendant's relative youth, lack of a significant prior criminal history, and the evidence in the record that up until about two years before the killings he had eschewed gang activities and had been a model student. On the defendant's direct appeal, he also argued that he had been merely caught up in a tragic series of events which would not have occurred but for one of the victims' boast that he had killed friends of the defendant. On his direct appeal, we characterized these mitigating circumstances as "meager." (*Caballero*, 102 Ill. 2d at 47.) The question is whether the testimony of the three witnesses rejected because of their views on the death penalty, and the other witnesses who were suggested by the family but not contacted by defense counsel, would have substantially added to the amount of mitigation before the jury.

William Dillon and Grace Constable would both have testified that the defendant had been an active participant in ICI for a period of 1½ years up until sometime in 1978, one year before the killings. Dillon would have testified that the defendant had frequently spoken in favor of ICI at local churches. Both would have testified to the defendant's good character, at a point in time considerably closer to the killings than could the mitigation witnesses who actually testified. In addition, Constable had known the defendant since 1972. She would have testified that, to her knowledge, Caballero was not a "hard-core" Latin King as late as three weeks before the murders. The Reverend Moore, who visited the

defendant in jail, would have testified that the defendant's older brother Jose had persuaded him to leave ICI and join the Latin Kings.

Additional testimony in mitigation might have been provided by several other witnesses whose names were suggested by the family but who were not directly contacted by defense counsel or who were not selected for unknown reasons. Don Gillaspie, the high school director of ICI, would have testified that he had known the defendant for 1½ years and was in "close contact" with him during that period. He would have testified that the defendant was "spiritually alert and sensitive," "unusually gentle," and that "no other Chicago street kid he had worked with was as gentle in personality and temperament." The defendant was invited to Gillaspie's wedding, and taken by ICI on fund-raising trips as "one of their best youths." He also stated in his affidavit that the defendant had been persuaded to leave ICI and join the Latin Kings by his older brother Jose. He did not oppose the death penalty in general but did not believe that the defendant should get the death penalty. Wayne Gropp, the program director of ICI, would have testified to the same general effect, as would have Tina Jakus, the junior high school director for ICI.

The testimony of these witnesses would have added considerable cogency and force to the defendant's argument that he was a "follower," and that his participation in the murders was an aberration. The value of this testimony must also be considered in connection with the prosecutor's arguments on summation. At trial, the prosecutor characterized the defendant as a "big gang member, big Latin King," and urged the jury to "tell the gangs that you're not going to let them turn your city and your country into a jungle." Given the circumstances of the killings, these comments were not improper, but they may have suggested to the jury that the

defendant had been involved in other "gang-related" crimes. Testimony that the defendant's involvement in the gangs was superficial or recent could have only helped to rebut this suggestion.

We are mindful of the Supreme Court's caveat in *Strickland* that the two prongs of its test for ineffectiveness "do not establish mechanical rules" and that the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." (466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) It is not easy to reweigh aggravating and mitigating factors. But, particularly keeping in mind the fact that the defendant's life is at stake, we believe, to a reasonable probability, that the jury may have struck the balance differently had they heard the testimony of the rejected witnesses. This conclusion may be changed or modified by whatever evidence is presented at the evidentiary hearing. But the decision not to introduce possible mitigation simply because the mitigation witnesses do not oppose the death penalty is so strange that we believe an evidentiary hearing to determine the truth of this allegation is required.

We emphasize that the question to be determined upon remand is whether the defendant was afforded the effective assistance of counsel. We assume that, as the defendant suggests, defense counsel will be called to testify at that hearing and will offer an explanation of his actions and strategy. The key question, of course, will not be what counsel told the potential witnesses, but what were his actual reasons for rejecting their testimony.

The only remaining contention of the defendant pertinent to his sentencing hearing is the contention that the defendant was prejudiced by the prosecutor's remarks that the defendant "was a vicious cold-blooded killer" who "kills people like he's swatting flies," and his query:

"That's the kind of person you're going to let go? To put on the street to do it again?" The characterization of the defendant as a cold-blooded killer was not improper. And while we have previously stated that "[t]he sentencing hearing is not intended to provide a soap box on which counsel can prey upon the fears of the jurors that the defendant may soon walk the streets again in search of another victim" (*People v. Szabo* (1983), 94 Ill. 2d 327, 367), we note that the remarks quoted occurred during trial and not during sentencing. These remarks were not so prejudicial as to require a new trial, and if the defendant does ultimately win a new sentencing hearing, we trust that they will not be repeated.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed in part and affirmed in part, and the cause is remanded to the circuit court for an evidentiary hearing on that portion of defendant's petition which alleges that he was denied a fair sentencing hearing by counsel's alleged failure to present certain witnesses in mitigation.

> *Judgment affirmed in part*
> *and reversed in part;*
> *cause remanded.*

JUSTICE CALVO took no part in the consideration or decision of this case.

JUSTICE MILLER, specially concurring:

I concur in the majority's opinion. I write separately, however, to highlight several concerns that may be relevant in subsequent proceedings in this case.

As the majority recounts, defense counsel had available to him a number of mitigation witnesses whom he did not choose to present at the defendant's death penalty hearing. According to affidavits supplied by three of the potential witnesses—William Dillon and Grace Con-

stable, employees of the Inner City Impact organization who knew the defendant from his involvement with that group, and the Reverend Douglas Moore, who had visited the defendant in jail—defense counsel rejected their testimony because they were not categorically opposed to the death penalty. This court has previously ruled, however, that testimony by mitigation witnesses concerning their attitudes toward the death penalty and its application to a particular defendant is not admissible at a capital sentencing hearing. (*People v. Stewart* (1984), 105 Ill. 2d 22, 67-68; *People v. Yates* (1983), 98 Ill. 2d 502, 535; *People v. Williams* (1983), 97 Ill. 2d 252, 300-01.) Inquiry into the beliefs of Dillon, Constable, and Moore regarding capital punishment would therefore not have been relevant, and a defense objection to attempted cross-examination on the subject would have been proper.

It appears, however, that the defendant's participation in Inner City Impact had ended about a year before his commission of the offenses in this case, and counsel may well have decided not to present the testimony of Dillon and Constable because the defendant's earlier activity in the group would have stood in sharp contrast to the gang-centered life he eventually chose to lead. Similar concerns may also have prompted counsel's decision not to present the testimony of Pastor Moore, who would have testified about the defendant's decision to leave Inner City Impact and join a street gang.

The majority suggests that counsel conducted only a cursory investigation in preparing for the defendant's sentencing hearing, waiting until the last minute to investigate possible sources of mitigating evidence. (126 Ill. 2d at 278-79.) I would note, however, that counsel's pretrial preparation may have as well accomplished much of the investigation relevant to the sentencing hearing, making unnecessary further extensive investiga-

tion following the defendant's conviction. See *Darden v. Wainwright* (1986), 477 U.S. 168, 184-85, 91 L. Ed. 2d 144, 159-60, 106 S. Ct. 2464, 2474.

An evaluation of defense counsel's performance must be based on the standard provided by *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which this court adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27. Under *Strickland* there is a strong presumption that counsel acted reasonably, and a defendant challenging counsel's performance must demonstrate that the attorney's conduct, when viewed against the circumstances of the case, fell outside the range of competent assistance. (466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) The *Strickland* Court noted, "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) I do not interpret our decision in this appeal as dictating any particular result in the proceedings on remand, and the circuit judge's evaluation of the circumstances surrounding trial counsel's performance will begin on a clean slate.

I am neither unmindful of nor unsympathetic to the concerns expressed by Justice Ryan in his dissenting opinion with respect to delay in our legal system. In this case, however, the circuit court dismissed the defendant's post-conviction petition without an evidentiary hearing, and we therefore have before us only the defendant's unrebutted allegations. Unanswered and unchallenged, those allegations raise a question concerning counsel's competency at the death penalty hearing.

Remanding the cause to the circuit court for an evidentiary hearing on this issue will allow the record to be developed so that we may then review, against the factual evidence, the defendant's claims concerning counsel's representation, rather than have the case proceed further with unanswered allegations. Had that been accomplished in the circuit court initially, the question of counsel's effectiveness could have been resolved in the present appeal. This is not to say, however, that an evidentiary hearing is necessary, or appropriate, in every case.

As I have pointed out, nothing in the majority opinion or in my special concurrence suggests what the eventual result should be, either in the circuit court or in this court on subsequent review. Once a hearing has been held, however, the trial judge, and later this court, will have available a complete record for evaluating the defendant's claims under *Strickland,* which, we all agree, provides the applicable standard.

An appropriate review at this time may very well shorten, rather than lengthen, the time it will take to get a final judgment in this case. Because only a single issue is presented, there is no reason why a hearing on remand and any appeal to this court cannot be accomplished on an expedited basis.

CHIEF JUSTICE MORAN joins in this special concurrence.

JUSTICE RYAN, concurring in part and dissenting in part:

I dissent from that portion of the opinion which remands this case for a hearing on the question of whether defendant was afforded effective assistance of counsel.

Initially, I voice my concern about the inordinate delay in this case. The crime was committed February 24,

1979. The defendant was arrested March 3, 1979. The original opinion in this court, affirming defendant's conviction and sentence on direct appeal, was filed March 23, 1984. Thus, more than five years elapsed between the crime and the disposition of the case on direct appeal. But that was only the beginning. It has taken almost five more years for this case to wend its way back to this court on appeal in the post-conviction proceeding. The holding of the majority opinion sends the case back to the trial court for further proceedings, which, if adverse to the defendant, will be reviewed again by this court a year or more from now. If this court then affirms on this case's third appearance here, 11 years or more after the crime was committed, the case will then start its journey through the Federal system. At some point before final judicial determination, Juan Caballero will probably expire from natural causes. We have so circumscribed our criminal procedure with due process concerns, and we so intently scrutinize the performance of counsel looking for something to support a claim of ineffective assistance, that our criminal process is hamstrung and a final resolution of these cases is difficult to achieve.

The charge of ineffective assistance of counsel is fast becoming the most popular avenue through which convicted persons seek relief. Many of us felt, following the decision of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, that the clear pronouncements of that case would decrease the number of cases in which such charges would be made. Instead, however, certain parts of that opinion, notably the two-pronged test of counsel's deficient performance and the reasonable probability of a different result absent counsel's deficient conduct, have become the focal point of the analysis of counsel's conduct with the benefit of

20/20 hindsight, and cases involving ineffective-assistance charges have proliferated.

The importance of the *Strickland* holding lies not only in the announcement of the two-pronged test. Equally, if not more, important is the admonition of *Strickland* that deference should be given to on-the-spot decisions made by trial counsel, and that the temptation to second-guess these decisions simply because of an adverse result should be resisted. I can do no better than to quote these admonitions at length:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act, or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.

*Strickland* warned against intrusive post-trial inquiry into counsel's performance such as has been exhibited in the majority opinion in this case. Such an inquiry, and the willingness of the courts to participate, can only encourage and bring about second trials in almost every criminal case where the defendant has been convicted. It is the willingness of the courts to participate in such hindsight analysis that has encouraged the filing of so

many charges of ineffective assistance of counsel. In this case, there have been three separate counsel: the first on the original trial, the second on appeal, and now a third represents the defendant in the post-conviction proceeding. In the post-conviction proceeding, both the conduct of the trial counsel and appellate counsel have been challenged on several grounds. Most of the majority opinion deals with analyzing these challenges. Most of these issues were simply judgment calls made by the trial attorney and should have been dealt with as such.

In support of the above comments, I again quote at length from *Strickland*:

> "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.
>
> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland v. Washington* (1984), 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066.

It appears that the majority opinion bases its belief that the post-conviction hearing petition requires a hearing on the fact that three potential witnesses, William Dillon, Grace Constable, and Reverend Douglas Moore, were not permitted to testify. According to the affidavits of these three potential witnesses, they were rejected by

counsel because they did not oppose the death penalty in all cases.

This is not a case where counsel did not investigate. The opinion holds that the rejection of those witnesses who were not contacted by counsel was probably justified. The basis of the holding that there should be a hearing focuses on the failure to call the three witnesses named above. Counsel had interviewed these witnesses, as well as others, and decided not to call them. He did present other witnesses, who presented defendant in a favorable light as a well-mannered, courteous student and neighbor, who liked to participate in sports. Counsel did not call other witnesses who, on cross-examination, could have detracted from that image, or who did not share the thesis of counsel's game plan that the death penalty was wrong and should never be applied. These were choices counsel made after he had interviewed the witnesses defendant had offered. In *Strickland v. Washington*, the Court stated that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington* (1984), 466 U.S. 668, 690-91, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066.

As noted above, the majority opinion finds that counsel's limitation of investigation was reasonable. The choice not to call as witnesses the three people named above, whom counsel had interviewed, was a strategic choice. Under the circumstances, the defendant must overcome the presumption that the challenged action might be considered sound trial strategy. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys

would not defend a particular crime in the same way." (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2065.) The Supreme Court stated in *Burger v. Kemp* (1987), 483 U.S. 776, 794, 97 L. Ed. 2d 638, 657, 107 S. Ct. 3114, 3126, in considering claims of ineffective assistance of counsel, " '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.' " In *United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045, a case decided the same day as *Strickland v. Washington*, the Supreme Court stated:

> "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—*even if defense counsel may have made demonstrable errors*—the kind of testing envisioned by the Sixth Amendment has occurred." (Emphasis added.)

Individual members of this court, if representing the defense, may not have made the same choices that counsel made. The choices made by counsel, judged by the benefit of hindsight, may not have been the best avenues to pursue. However, these were strategic choices that counsel knowingly made, and they should not be disturbed. We simply cannot retry every case because the defendants are dissatisfied with the results of their trials and level charges of incompetence against their counsel.

Our Post-Conviction Hearing Act authorizes the court to dismiss a petition if it is frivolous and patently without merit. (Ill. Rev. Stat. 1985, ch. 38, par. 122—2.1.) The Act also authorizes the State to move to dismiss the petition, which the court may grant or deny (Ill. Rev. Stat. 1985, ch. 38, par. 122—5), and the Act provides for a hearing on the petition (Ill. Rev. Stat. 1985, ch. 38, par. 122—6). However, this court has held that a post-

conviction petition is not entitled to a hearing as a matter of right, but that a hearing should be conducted only when the petition makes a substantial showing of a violation of constitutional right. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365; *People v. Gaines* (1984), 105 Ill. 2d 79, 91-92; *People v. Curtis* (1971), 48 Ill. 2d 25, 27.) In my opinion, under the analysis of the holding of *Strickland v. Washington,* the defendant did not make a substantial showing of ineffective assistance of counsel by the allegations of his petition and the affidavits filed in support thereof. Therefore, this court should not have remanded this case for a post-conviction petition hearing.

The interminable trying and retrying of criminal cases should cease. At some point the judgment of the court must become final and the defendant must face the reality of his sentence. The majority opinion, in my view, will only encourage the filing of future charges of incompetence of counsel, which, if judged by the same standards of the majority opinion, will further prolong litigation.

For these reasons, I dissent from the portions of the opinion above indicated.