(No. 72593.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JAMES E. WITTENMYER, Appellee.

*Opinion filed October 1, 1992.*

Roland Burris, Attorney General, of Springfield, and Marc P. Bernabei, State's Attorney, of Princeton (Kenneth R. Boyle, Norbert J. Goetten, John X. Breslin

and Gary F. Gnidovec, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Paul Bradley, of Chicago, for appellee.

JUSTICE CLARK delivered the opinion of the court:

Following a bench trial in the circuit court of Bureau County, defendant, James E. Wittenmyer, was convicted of three counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16) and one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14). Defendant was sentenced to concurrent five-year terms for each of the three aggravated criminal sexual abuse convictions, and to seven years' imprisonment for the aggravated criminal sexual assault conviction, which was to run consecutively to defendant's other convictions.

The appellate court affirmed defendant's convictions, but found that the circuit court erred in imposing a consecutive sentence for defendant's aggravated criminal sexual assault conviction. Consequently, the appellate court modified the judgment of the circuit court: vacating defendant's consecutive sentence for aggravated criminal sexual assault and ordering that it be served concurrently to defendant's sexual abuse convictions. (216 Ill. App. 3d 1042.) We granted the State's petition for leave to appeal (134 Ill. 2d R. 315). In addition, defendant has requested cross-relief (134 Ill. 2d R. 315(g)), arguing that there was insufficient evidence to support a conviction on any of the four counts, and that defendant was denied a fair trial by the introduction of out-of-court statements and the intentional destruction of discoverable notes of interviews.

Testimony at trial revealed that in October 1988, Judy L. and her four children, G.L., D.L., Angela, and

Louis, moved to La Moille, Illinois. They lived approximately four blocks from Judy's mother and step-father, Joanne Wittenmyer and defendant. Subsequently, in late June 1989, Judy suffered a mental breakdown and attempted suicide. She was hospitalized for a week, and then went to New Jersey to live with her brother for a month. During the time Judy was hospitalized and living in New Jersey, her four children lived with Joanne and defendant. In the summer of 1989, D.L. was 10 and her brother G.L. was 13.

Judy testified that one week after she returned from New Jersey, on August 7, 1989, D.L. told her that defendant had been sexually abusing her. Two weeks later, on Labor Day weekend, Judy explained to G.L. that defendant had been sexually abusing D.L. and that the family had to move to La Salle. At this time, G.L. began to cry and told Judy that defendant had also been sexually abusing him.

D.L. testified that in the last incident of abuse, which occurred in late July or early August, defendant accompanied D.L. to her mother's house to retrieve a pair of biking shorts. While D.L. and defendant were in the basement looking for the shorts, defendant "leaned" D.L. against a cabinet, and got down on his knees. D.L. testified that defendant lifted her shirt and bra and rubbed and sucked her breasts. Then, defendant put his hand down her pants and rubbed her vagina. After a minute, defendant attempted to insert his finger into her vagina. D.L. testified that she felt pain and she could feel defendant "pushing up, like up and down and everything." According to D.L., defendant inserted his finger approximately to the first knuckle. This incident of abuse served as the basis for two of the counts of aggravated criminal sexual abuse, and the one count of aggravated criminal sexual assault.

D.L. also testified that defendant had sexually abused her on five to six prior occasions at her mother's house. Each time, D.L. had been sent to retrieve the biking shorts, which belonged to her aunt Jaimie, and defendant accompanied her to the house. In addition, D.L. testified that defendant had sexually abused her one time at defendant's house.

On cross-examination, D.L. reaffirmed that this last incident of abuse occurred prior to her mother's returning from New Jersey. Previously, in September 1989, D.L. had told the investigators that this last incident of abuse occurred after Judy returned from New Jersey. Moreover, D.L. admitted that when she first spoke with the investigators back on September 4, 1989, she told them that she was not sure whether defendant had inserted his finger during the last incident of abuse. But, she explained that she thought the investigators' question referred to the insertion of defendant's whole finger.

G.L. testified to an incident in early August 1989, while he was living with his grandmother and defendant. According to G.L., one evening he was alone in the living room watching television. Defendant arrived home from work at approximately 10:30 p.m., and after taking a shower, joined G.L. on the couch. At this time, G.L. testified that defendant pulled out his penis and asked G.L. to give it "a rub." G.L. rubbed defendant's penis for approximately 45 seconds, at which time defendant went to the bathroom. This incident, which had happened on two prior occasions, served as the basis for the third count of aggravated criminal sexual abuse.

G.L. also testified to other instances of abuse. Specifically, G.L. stated that defendant had G.L. masturbate him in defendant's car while they drove to Mendota, Illinois. G.L. estimated that the total instances of sexual abuse during the summer of 1989 numbered 10 to 15.

G.L. testified that he never told anyone about this sexual abuse because he was afraid "everyone would be mad at him." G.L. finally told his mother, Judy, after Judy told G.L. that defendant had been sexually abusing his sister, D.L.

On cross-examination, G.L. admitted that he had told the investigators back in September 1989 that he had been sexually abused at his mother's house on five to six prior occasions. On approximately two to three of these times, G.L. and defendant had gone to his mother's house to repair a broken water pipe or faucet.

Detective Brett Taylor testified that on September 6, 1989, he interviewed defendant's wife, Joanne, and that she admitted that defendant and G.L. had been alone in defendant's car on "numerous" occasions. Detective Taylor also testified to a conversation he had with Jaimie Wittenmyer, defendant's and Joanne's daughter, in which she told him that defendant and D.L. had gone alone to Judy's house on "four occasions or maybe more" to look for the biking shorts.

Detective Taylor also testified to three interviews with D.L. occurring on September 4, 1989, September 15, 1989, and February 22, 1990. D.L.'s out-of-court statements made during these three interviews were admitted pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). Taylor testified in detail about D.L.'s statements at each interview, and that D.L.'s statements were consistent throughout. Regarding the September 4 interview, Taylor testified that D.L. described six incidents in which defendant sexually abused her at Judy's house while they were looking for Jaimie's biking shorts. Four of these incidents occurred in the basement, while two occurred in the kitchen. In terms of whether defendant's finger penetrated D.L.'s vagina during the last incident of abuse, Taylor testified that D.L. stated

"[defendant] tried to put a finger into her vagina and she knew this because it hurt."

Regarding the September 15 interview, Taylor testified that D.L. did not know the interview had been scheduled and that he did not refresh her recollection about her statements from the September 4 interview. Taylor testified that D.L.'s statements during this second interview were consistent with those of the September 4 interview. D.L. again stated that there were six incidents of sexual abuse at her mother's house while she and defendant looked for the biking shorts.

Regarding the February 22 interview, D.L. recounted the six instances of abuse at her mother's house and also "clarified" whether defendant inserted his finger into her vagina. Taylor testified that D.L. stated that, in the prior interviews, she was under the impression that the investigators were asking if defendant's entire finger had been inserted into her vagina. D.L. stated that defendant's finger did not fully go into her vagina, but "up to the first knuckle."

On cross-examination, Taylor admitted that in his police report from the September 4 interview, he wrote that "[D.L.] did not know if the finger actually went into her vagina but stated that it hurt." However, Taylor testified that D.L. stated that defendant "tried to insert the finger, but she was not sure." In addition, Taylor admitted that although he testified on direct that during the September 15 interview D.L. stated that defendant tried to insert his finger and that it hurt, Taylor failed to put that in his report. Taylor maintained that D.L. did discuss this during the September 15 interview, but he forgot to include it in his report. Taylor also admitted that D.L. stated for the first time during the February 22 interview that defendant's finger was inserted into her, and that D.L. stated that the finger was "pushing in and out."

Following Taylor's testimony, the State rested, and defense counsel called several witnesses. Sharon Pontellis, Judy's sister, testified that on the Saturday of Labor Day weekend, 1989, she, her husband Thomas, and their daughter Rachel went to defendant's house in La Moille. Defendant and Joanne had left for a family reunion in Indiana. Sharon stated that when they arrived at approximately 9:30 p.m., Judy came over to defendant's house and told her that "she knew for a fact" that defendant had been molesting at least four of the kids— G.L., D.L., Rachel, and Jaimie. Sharon testified that she did not believe Judy because she is a "liar." Sharon also testified that on the following day, she called everyone together to have an "open discussion." Sharon stated G.L. refused to talk, but D.L. said that defendant had "messed with" Rachel in the basement and then sent her upstairs. According to D.L., Rachel said "It's your turn, [D.L.]," and sent D.L. downstairs. At this point, Rachel said D.L. was a liar.

Thomas Pontellis testified that he spoke with G.L. and D.L. on the Sunday of Labor Day Weekend 1989 concerning the sexual abuse. Pontellis stated that G.L. told him that defendant had G.L. rub his "private parts" two or three times while they were alone in the car. Further, G.L. stated that this abuse never occurred in the house, only in the car. Pontellis testified that D.L. told him that defendant "would rub her on her private parts" in an upstairs bedroom and the basement of defendant's house. Pontellis stated that on one occasion in the summer of 1989, he, G.L. and defendant went to Judy's house to repair a broken pipe or faucet. Pontellis testified that the repairs took approximately one hour, and nothing unusual happened.

Pontellis also testified to a conversation which was held around the kitchen table on Sunday of Labor Day weekend. Pontellis, his wife Sharon, Judy, D.L., G.L.,

Jaimie Wittenmyer and Pontellis' daughter Rachel were present. According to Pontellis, when he asked D.L. where the abuse took place, D.L. pointed to a basement and an upstairs bedroom in defendant's house. D.L. then told Pontellis that his daughter Rachel was also being abused. D.L. explained that while defendant and Rachel were in the basement, defendant abused her. D.L. stated that Rachel then came upstairs and told D.L. to go down to the basement. Rachel responded, stating, "How dare you say that, [D.L.], we're all over here all the time playing with you, if there is any abuse being done to you, I should have known about it."

Nancy Martinez, Judy's sister, testified to the character of Judy, G.L. and D.L. Martinez stated that Judy's reputation in the community is that she is dishonest, untrustworthy, and unreliable. Martinez testified that G.L. likes to lie and will invent things in order to be the center of attention. Lastly, Martinez said that D.L. has a reputation for dishonesty, and that she would not believe D.L.'s testimony under oath.

Defendant testified, denying that he sexually abused D.L. and G.L. In addition, defendant stated that when Judy's former husband, Raul, would physically beat her, he would regularly drive to Joliet to offer his assistance and protection. When Judy left Raul and moved to La Moille with her four children, defendant assisted and rented a truck for Judy. Defendant also stated that after Judy attempted suicide, defendant purchased a round-trip airline ticket for Judy to visit her brother in New Jersey. When Judy returned from New Jersey, defendant stated that she requested that defendant give her $1,000 so that she could move back to New Jersey to open a business with her brother. Defendant stated that Judy wanted defendant and his wife, Joanne, to care for Judy's children when she returned to New Jersey. Defendant stated that he did not give Judy the $1,000.

Regarding the sexual abuse allegations, defendant stated that Joanne would usually wake up the children, and he would do it only "on extreme rare occasions." Defendant testified that he was alone with G.L. in the car "several times," but he denied asking G.L. to fondle him. Moreover, defendant stated that he went over to Judy's to repair a broken water pipe on only one occasion, and G.L. and Tom Pontellis accompanied him. Defendant also admitted that he went to Judy's house on one occasion to retrieve the biking shorts, but he stated both D.L. and G.L. accompanied him.

On cross-examination, defendant admitted that Judy and her children's financial condition is considerably worse now, after making the sexual abuse allegations, than it was during the summer of 1989 when defendant provided them financial assistance. Also, defendant stated that during the summer of 1989, he never went into his daughter Jaimie's, D.L.'s or G.L.'s bedrooms.

Lastly, Conrad Knuth, an attorney, testified that he was retained by Judy in August 1988 at defendant's suggestion. Knuth stated that one year later, on August 11, 1989, he had a telephone conversation with Judy concerning her desire to give up rights to marital property. A week later, on August 18, 1989, Knuth had another telephone conversation with Judy in which she expressed her desire to relinquish control of her children to defendant.

The trial judge found defendant guilty of the two counts of aggravated criminal sexual abuse and the one count of aggravated sexual assault pertaining to D.L., and of the one count of aggravated criminal sexual abuse pertaining to G.L. The trial judge acknowledged that although there were some inconsistencies brought out by the prior statements of G.L. and D.L., these inconsistencies were not "major." Specifically, the trial judge stated:

"[B]ecause I do not wish to deprive any person of life, liberty and property without a fair hearing, [I] searched the following evidence to determine whether I could find a reasonable doubt to disbelieve those children. Frankly, I failed to do it. I found none.

\* \* \*

I am also pretty convinced that children may be able to be taught easily to lie, more easily than adults, but they cannot be taught to do it well. And the testimony here was virtually not shaken."

The appellate court affirmed defendant's convictions, but found that the circuit court erred in imposing a consecutive sentence for defendant's aggravated criminal sexual assault conviction. As we noted earlier, the State appealed this modification of the sentence. Defendant has also requested cross-relief, and we will discuss those issues first.

Initially, defendant argues that he was denied a fair trial because Detective Taylor was allowed to testify at trial regarding out-of-court statements D.L. made to him and other investigators. As we noted earlier, Detective Taylor testified that he and other investigators interviewed D.L. regarding these sexual abuse allegations on September 4, 1989, September 15, 1989, and February 22, 1990. At trial, Detective Taylor testified in detail about D.L.'s statements at each interview. D.L.'s out-of-court statements were admitted pursuant to section 115—10 of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). Defendant maintains that the use of D.L.'s out-of-court statements in this case "expose[d] the danger of misuse of the rule." Specifically, defendant complains that there was no attempt to record D.L.'s statements during these interviews through the use of a court reporter, video camera or tape recorder; nor was a representative of the defendant allowed to be present for the interviews.

Section 115—10 provides that in the prosecution of a sexual offense committed on a child under age 13, the testimony of an out-of-court statement made by the child pertaining to the sexual offense may be admissible as an exception to the hearsay rule. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) Under section 115—10, such testimony is admissible if:

"(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborating evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, pars. 115—10(b)(1), (b)(2).

In this case, an evidentiary hearing was held in which Detective Taylor testified to the time, content, and circumstances of D.L.'s statements during the three interviews. The trial judge, after listening to Taylor's testimony, concluded that the time, content and circumstances of the statements provided sufficient safeguards of reliability. In particular, the trial judge noted that nonleading questions were asked and the answers received were basically in D.L.'s own words. Further, the trial court noted that there was nothing to indicate the interviews were threatening or coercive in nature.

We agree with the trial court and appellate court that the statutory requirements of section 115—10 were met and that D.L.'s statements during these interviews were admissible. Defendant's assertions that procedural safeguards, such as recording or videotaping, should have been used and that a representative of defendant should have been present for the interviews are meritless. As the State notes, defendant has not cited any authority to

support his assertions, and in fact, the Supreme Court has rejected the adoption of such procedural safeguards (see *Idaho v. Wright* (1990), 497 U.S. 805, 818, 111 L. Ed. 2d 638, 654, 110 S. Ct. 3139, 3148).

Defendant also claims he was denied a fair trial because Detective Taylor "intentionally" destroyed his handwritten notes of the three interviews with D.L. Defendant relies on Supreme Court Rule 412(a)(1), which requires the State to disclose to defense counsel "memoranda containing substantially verbatim reports of [witnesses'] oral statements." (134 Ill. 2d R. 412(a)(1).) Although Detective Taylor did transcribe his notes into official reports, defendant argues that these handwritten notes might have been invaluable to his defense, particularly with regard to the aggravated criminal sexual assault charge in which defendant was accused of slight digital penetration of D.L.'s vagina. Defendant maintains that since it was not until the third interview, on February 22, 1990, that D.L. described actual penetration, the handwritten notes might have shed some light on D.L.'s apparent change in story.

The State maintains that Detective Taylor acted in conformity with the discovery rules because he reduced the contents of his handwritten notes to official reports, which were then provided to defense counsel. The State relies primarily on *People v. Howard* (1984), 121 Ill. App. 3d 938. In *Howard*, after interviewing the defendant on separate occasions, an investigator and an assistant State's Attorney destroyed their handwritten notes of the defendant's oral statements. The investigator destroyed his notes after determining the substance of the defendant's statements was contained in a police report, whereas the assistant State's Attorney destroyed her notes after noting in a memo to her superior that the substance of the defendant's statements was contained in a written statement signed by the defendant. Defense

counsel was provided the police report and the defendant's written statement during discovery. *Howard*, 121 Ill. App. 3d at 948.

In holding that the State did not violate Supreme Court Rule 412, the appellate court stated that the purpose of discovery "is to prevent the production of surprise evidence or testimony which would serve to prejudice defendant's case." (*Howard*, 121 Ill. App. 3d at 948.) Because the substance of the handwritten notes was contained in the police report and the defendant's written statement, "the destruction of the notes did not and, indeed, could not have resulted in the type of surprise testimony which the discovery rules were designed to prevent." (*Howard*, 121 Ill. App. 3d at 948.) Consequently, "by ensuring that the substance of their notes were documented elsewhere before destroying them, the investigator and assistant State's Attorney acted in conformance with the discovery rules." *Howard*, 121 Ill. App. 3d at 948.

Although Detective Taylor's notes would have been discoverable under Rule 412(a)(i) had they not been destroyed, we find defendant has suffered no prejudice. "Noncompliance with discovery requirements does not require reversal absent a showing of prejudice." (*People v. Greer* (1980), 79 Ill. 2d 103, 120.) At the evidentiary hearing for the admissibility of D.L.'s three interviews, Detective Taylor stated that he typed up the reports directly off his handwritten notes, and that he was as thorough as possible. Thus, as in *Howard*, the destruction of Taylor's notes did not result in the type of surprise testimony which the discovery rules were designed to prevent. See *Howard*, 121 Ill. App. 3d at 948; *People v. Miller* (1989), 190 Ill. App. 3d 981, 990-91 (stating that "we believe that when the substance of a statement is contained in a police report that has been previously furnished to the defense pursuant to discovery, the pur-

pose of the rule has been satisfied and no prejudice results from the withholding of another memorandum of the same statement").

Next, defendant argues that there was insufficient credible evidence to support any of his four convictions, particularly his conviction for aggravated criminal sexual assault. Defendant maintains that the State's entire case depended on the credibility of D.L. and G.L., whose testimony defendant claims was impeached and contradicted by credible witnesses. Moreover, defendant claims that D.L. and G.L. were "under the influence of an unstable mother who felt defendant had let her down and was angry with him." Defendant asserts that, as in all cases involving allegations of sexual abuse of children, the victim's testimony must be clear and convincing or must be corroborated, citing *People v. Kolden* (1962), 25 Ill. 2d 327.

Initially, we note that the sex-offense standard of review articulated by defendant, that a victim's testimony must be clear and convincing or substantially corroborated, has been rejected by this court. In *People v. Schott* (1991), 145 Ill. 2d 188, this court held that the reasonable doubt test articulated in *People v. Collins* (1985), 106 Ill. 2d 237, should govern an appellant's claim of evidentiary insufficiency in sex-offense cases. According to *Collins*, criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The specific test to be employed on review " ' "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *Schott*, 145 Ill. 2d at 203, quoting *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443

U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

In this case, we agree with the appellate court that there was sufficient credible evidence to support defendant's four convictions. As the appellate court stated, "[a] review of the record shows that the basic facts related by D.L. and G.L. concerning the two incidents of abuse serving as the basis for the indictments against the defendant remained consistent." (216 Ill. App. 3d at 1046.) In finding defendant guilty, the trial judge, as the fact finder, was unequivocal that he believed the testimony of D.L. and G.L. and rejected the testimony of defense witnesses. The trial judge's remarks in denying the defendant's motion for a new trial further reflected his view of the credibility of the witnesses:

> "I don't think anything new has been presented here. I see that [defense counsel] is trying to emphasize here certain points in the testimony. And in all due respect, he should do that, it's his job. But I heard this evidence and when we got to the issue of the credibility of the two complaining witnesses, the evidence concerning their untruthfulness was placed before this court through family members which the court [sic] to be more untruthful by far, that is, less credibility. *In fact, I made the statement that with the possible exception of Tom Pontellis and his wife, I really don't believe much of anybody that testified for the defense.* Now it's a question of credibility and that's the credibility issue that I ruled on and that's the decision I made ***." (Emphasis added.)

The credibility of the witnesses and the weight to be given their testimony is exclusively within the province of the trier of fact. (*People v. Boclair* (1989), 129 Ill. 2d 458, 474.) That determination is entitled to great deference, and when the sufficiency of the evidence is challenged, we will not retry the defendant. (*Schott*, 145 Ill. 2d at 206.) Here, the trial judge assessed the credibility of the witnesses, and resolved any conflicts or inconsis-

tencies in their testimony. Thus, we find that the evidence was not so improbable or unsatisfactory that it created a reasonable doubt of the defendant's guilt.

With regard to defendant's conviction for aggravated criminal sexual assault, defendant argues that the evidence was insufficient to establish penetration as required by the statute. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—14.) Defendant maintains that although D.L. testified at trial to slight digital penetration of her vagina, her earlier statements to Detective Taylor impeached her testimony and created a reasonable doubt as to the element of penetration. We disagree, and find that when the evidence is viewed in the light most favorable to the prosecution, the trial judge could have found the essential element of penetration. See *Collins*, 106 Ill. 2d at 261.

Although D.L. did not definitively state that defendant's finger penetrated her vagina until the third interview, on February 22, 1990, her prior statements to Detective Taylor in the September 4 and September 15 interviews did not contradict her trial testimony. Rather, as D.L. herself testified at trial, they reflected her confusion about whether the investigators were asking if defendant's whole finger had been inserted into her vagina. Detective Taylor's official report from the first interview, on September 4, 1989, indicated that defendant attempted to insert his finger in D.L.'s vagina, and that D.L. felt pain. D.L. stated that she was not sure if defendant's finger actually penetrated. Regarding Taylor's official report for the September 15 interview, no mention is made of whether defendant inserted or attempted to insert his finger. Detective Taylor, however, testified at trial that D.L. did state that defendant tried to insert his finger and that she said it hurt.

At trial, D.L. testified that defendant put his hand on her vagina and began rubbing. D.L. stated that after a

minute, defendant put his finger into her vagina, and that she knew this because "it hurt and [she] could feel it." D.L. testified that defendant "was pushing up, like up and down and everything." Based on what she could feel, D.L. indicated that defendant inserted his finger up to approximately the first knuckle. On cross-examination, defense counsel questioned D.L. about her interview on September 4, 1989, with Detective Taylor and the other investigators.

"Q. [Defense Counsel]: When you first talked to the investigators back that first time, September 4, 1989, that was that Labor Day week-end when they came out to your house, did you tell them then that your grandfather had put a finger in you?

A. I told them that I wasn't sure if he did, but I told them he was rubbing me and everything and I thought he did but I wasn't sure because, well, I told them no, I told them that I wasn't sure because it did hurt and everything and I wasn't—

Q. You told them no but you weren't sure.

A. Yes because I really thought they meant the whole finger and everything and plus, and I told them it did hurt, plus I told them it did hurt.

Q. You told them it hurt?

A. Yes.

Q. But you didn't know if a finger was put into you?

A. Yes, the whole finger.

Q. Did you know on that day if the finger was put into you?

A. I knew but I thought they meant the whole finger so—

Q. You knew or you didn't know?

A. Well, I kind of did because I thought they meant the whole finger and everything and then I just, like this much of the finger, and I thought they meant the whole finger, so I just told them that."

D.L.'s explanation on cross-examination makes clear that she initially thought the investigators were asking if

defendant's entire finger had been inserted in her vagina. In her February 22, 1990, interview, D.L. explained her confusion and clarified that defendant inserted his finger into her vagina approximately to the first knuckle. The trial judge found D.L.'s explanation credible, and we will not reverse that decision. See *Schott*, 145 Ill. 2d at 206 ("[T]he jury is charged with the responsibility of weighing the credibility of witnesses and resolving any conflicts and inconsistencies in their testimony").

Lastly, we address the State's argument that the appellate court erred in vacating defendant's consecutive sentence for his aggravated criminal sexual assault conviction. Defendant was convicted of the two counts of aggravated criminal sexual abuse and the one count of aggravated criminal sexual assault pertaining to D.L., and the one count of aggravated criminal sexual abuse pertaining to G.L. Defendant was sentenced to concurrent terms for each of the three aggravated criminal sexual abuse convictions, and to seven years' imprisonment for the aggravated criminal sexual assault conviction, which was to run consecutively to defendant's other convictions.

Section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a)) provides in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, *unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively.*" (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).

The appellate court interpreted this section to require both a conviction for a Class X or Class 1 felony plus an additional conviction for a violation of section 12—13 or 12—14 of the Criminal Code of 1961 before a consecutive sentence can be imposed. (216 Ill. App. 3d at 1047.) In this case, the appellate court held that "[a] single conviction for violation of section 12—14, which is a Class X felony, cannot serve as the basis for consecutive sentences when the defendant has no other convictions of violations of section 12—13 or 12—14, and has not been convicted of any other Class X or Class 1 felony." 216 Ill. App. 3d at 1047-48.

The appellate court's interpretation of this section indicates to us that it misread the plain language of the statute. According to the rules of statutory construction, " '[w]here the statutory language is clear and unambiguous, a court must enforce the law as enacted without considering other aids of construction.' " (*People v. Drakeford* (1990), 139 Ill. 2d 206, 214, quoting *People v. Ferguson* (1989), 132 Ill. 2d 86, 97.) Further, the intent of the legislature can be best determined by the plain and ordinary meaning of the statutory language. *People v. Pettit* (1984), 101 Ill. 2d 309, 313.

After carefully reviewing the plain language of this section, we believe that the legislature has provided for *two exceptions* to the general rule that a trial court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. First, if one of the offenses for which defendant was convicted was a Class X or Class 1 felony *and* the defendant inflicted severe bodily injury, the legislature has mandated that the trial court impose consecutive sentences. Second, if the defendant was convicted of a violation of section 12—13

or 12—14 of the Criminal Code, the legislature has mandated that the trial court must impose consecutive sentences. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).

Our interpretation, as opposed to the appellate court's, is supported by the legislative history of section 5—8—4(a). Initially, in 1973, section 5—8—4(a) provided that consecutive sentences could not be imposed for "offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(a).) Subsequently, in 1978, the following italicized language was added to section 5—8—4(a): *"unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively."* (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(a).) Then, effective July 1, 1988, the legislature amended section 5—8—4(a) to its present form, adding the language "or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).

This legislative history clearly indicates to us that the legislature intended to have two separate and distinct exceptions to the general rule that the court shall not enter consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective—one, if the defendant was convicted of a Class X or Class 1 felony and inflicted severe bodily injury, or two, if the defendant was convicted of a violation of section 12—13 or 12—14 of the Criminal Code.

Applying our interpretation of the plain language in section 5—8—4(a), we find that the trial court correctly sentenced defendant to a consecutive term of seven years for his conviction of aggravated criminal sexual assault under section 12—14 of the Criminal Code.

For the reasons stated, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court is affirmed.

*Appellate court affirmed*
*in part and reversed in part;*
*circuit court affirmed.*