No. 3--02--0390

_________________________________________________________________

    IN THE

                   APPELLATE COURT OF ILLINOIS

                         THIRD DISTRICT

                           A.D., 2004

THE PEOPLE OF THE STATE         )  Appeal from the Circuit Court

OF ILLINOIS,                    )  of the 21st Judicial Circuit,

       )  Kankakee County, Illinois,

Plaintiff-Appellee,       )

                                )

v.                         )  No. 00--CF--162

  )

KENDRIC L. HAYES, a/k/a James   ) 

D. Vance,                       )  Honorable

  )  Kathy Bradshaw-Elliott,

Defendant-Appellant.       )  Judge Presiding.

________________________________________________________________

JUSTICE SCHMIDT delivered the opinion of the court:            ________________________________________________________________

A Kankakee County jury found defendant Kendric L. Hayes, also known as James D. Vance, guilty of two counts each of attempted first degree murder and aggravated battery with a firearm (720 ILCS 5/8--4, 9--1(a)(1); 12--3, 12--4.2(a)(1) (West 2000)).  Defendant appeals.  He contends that (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of one count each of the charged offenses; (2) the trial court denied him his right to present a defense; and (3) the prosecutors' closing arguments deprived him of a fair trial.  We affirm.

FACTS

The State's evidence established that on the afternoon of October 13, 1999, defendant visited the brothers Elisha and Elijah Dabney and their friend, Darryl Jordan, at the Dabney residence in Hopkins Park.  Defendant invited the Dabneys and Jordan to party with him at defendant's girlfriend's home in Kankakee.  Defendant's girlfriend, Lola Brown, was the mother of Eric Tatum, a friend of the Dabneys and Jordan.  The invitees, all under age 21, promptly accepted the invitation and got into defendant's vehicle.  En route to Brown's house, defendant first stopped at a dog kennel, where defendant reported that his children's rottweiler puppies had been missing from his home since the night before.  Defendant next drove to a liquor store to purchase alcohol and cigars.  

At Brown's house, defendant offered the young men drinks and "swisher" cigars laced with marijuana.  At some point, Tatum and another friend stopped by and joined the party for a short while.  After they left, defendant retrieved a shotgun which Elisha described as a black, 12-gauge sawed-off with the handle cut and black tape on the end.  Defendant ordered the Dabneys and Jordan to get down on the floor.  He aimed the gun at them and asked who had broken into his house.  Defendant kicked both of the Dabney brothers in the head and then fired once at Jordan, hitting him in the left shoulder.  Defendant then left the house with the shotgun.  Jordan yelled at Elisha to run for help, and then he passed out by the front door.  Elisha ran out the back door and proceeded to the liquor store to telephone the police. 

On cross-examination, Elisha said he sold a Cutlass Supreme to defendant two months before the shooting incident.  He denied that he sold anything other than the car.  He also denied that anyone else was present at the time of the sale.  He said he never had a weapon or saw the shotgun used in the shooting incident before defendant pulled it out and aimed it at them.  On redirect, Elisha testified that he did not own the shotgun; he did not pull it out on the date of the incident; he did not struggle with defendant for control of the gun; and it did not discharge accidentally.

Elijah testified that buckshot hit him under his left eye.  He said he ran across the street after defendant left.  There, he encountered Brown and Kankakee police officer Avery Ivey, Jr.  Elijah told the officer that he had been shot.  Ivey observed that Elijah's face was bleeding from a round gunshot wound.  He radioed for an ambulance and assistance.

Patrolman Jose Lema arrived on the scene and approached the front of the house, where he found Jordan's body blocking the door.  He entered the house through the rear door and determined that Jordan had suffered a large gunshot wound to the back.  Detective Earl Cote, who also responded to the scene, testified that he observed a gunshot wound to Elijah's left cheek as he and Jordan were being loaded into the ambulance.  Cote said the shape and size of the wound were consistent with buckshot recovered from inside the house. 

Elijah was transported from St. Mary's Hospital to Loyola by helicopter.  He testified that he was "in bad shape" and never saw what, if anything, was removed from his face.  Jordan testified that he was treated for a punctured lung and three broken ribs.  Buckshot removed from Jordan's body at the hospital was turned over to Cote and admitted into evidence at trial.  

Following the State's case in chief, defendant called his live-in girlfriend, Kathy Black, as his first witness.  Black testified that she knew Elisha Dabney as "Pee Wee."  She said that he came to her home in mid-August 1999, seeking to sell his 1989 gray Cutlass to defendant.  Black said she was interested in the car and looked inside.  At that point, the prosecutor objected to the relevancy of Black's testimony.

In an offer of proof, Black stated that on the front passenger seat of the Cutlass she observed a long gun with gray duct tape on the thick end where the handle had been cut.  She said that Pee Wee offered to sell the gun to defendant, but he declined.  She said Pee Wee then removed the gun from the car.  Black paid for the car, and defendant drove him home.  On cross-examination, the prosecutor asked if the gun was a rifle.  Black responded, "That's what I would say, some type of gun." 

Following arguments of counsel, the court sustained the prosecutor's objection.  The court ruled that Black's testimony regarding the gun was not relevant, because the gun she described was not the same one used in the offense.  Further, the testimony could not be admitted for impeachment purposes because no foundation was laid during defense counsel's cross-examination of Elisha Dabney.  Based on the court's ruling, defense counsel released Black, and the court instructed the jurors that they were not to concern themselves as to why she would not be testifying further.

Defendant then testified on his own behalf.  He initially admitted that he had a 1997 conviction for simple robbery.  He said that Elisha brought the sawed-off shotgun with him when defendant picked up the three men on the date of the offense.  Defendant said that after Tatum left the party, defendant asked Elisha about the puppies.  Defendant told him that he had heard that Elisha had been at his house the night before.  Defendant said that a big argument ensued, and Elisha became very defensive.  He said Elisha reached over and grabbed the shotgun.  Defendant then dashed across the room and grabbed the gun.  During a struggle over the gun, it discharged and Jordan fell to the floor.  Defendant said he then poked Elijah under his left eye with the barrel of the gun.  He checked Jordan's wound and presumed he was dead.  Defendant said he then "panicked, freaked out" and left.  Defendant denied that he intended to kill Elisha or Jordan.

On cross-examination, defendant explained that he fled the scene and checked into a motel in East Hazelcrest under the name of James Vance.  He left his car with the shotgun on the back seat at the motel and went to Mississippi.  Defendant denied that he ever owned a gun, but he admitted that the police had found him in possession of a .380-caliber handgun approximately two weeks before the shooting incident.

In rebuttal, the State impeached defendant's denial of gun ownership with evidence that he gave a written statement to the police on January 24, 2001, in which he said, "I had my gun taken by another agency (police)."   Defendant also said during the January 2001 interview that he struck Elijah under the right eye with the shotgun.

Following closing arguments, the jury found defendant guilty as charged.  The court subsequently denied posttrial motions and imposed consecutive prison sentences of 18 and 6 years for the attempted murders of Darryl Jordan and Elijah Dabney, respectively.  

ISSUES AND ANALYSIS

1.  Reasonable Doubt

On appeal, defendant first contends that the State failed to prove attempted murder and aggravated battery of Elijah Dabney, because the evidence was insufficient to show that the wound on Elijah's face was caused by a shotgun projectile.  Defendant suggests that, in the absence of physical evidence or medical testimony proving that a projectile was removed from Elijah's face, the wound could have been caused by a pebble on defendant's shoe.

When reviewing the sufficiency of the evidence, we must consider all evidence introduced at trial in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Wittenmyer
, 151 Ill. 2d 175, 601 N.E.2d 735 (1992).  This court will not overturn a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt as to the defendant's guilt.  
People v. Collins
, 106 Ill. 2d 237, 478 N.E.2d 267 (1985).  

Defendant cites to no authority that would require the State to produce medical or forensic evidence to prove the offenses charged.  The State's theory of guilt with respect to Elijah's wound was one of transferred intent--
i.e.
, Elijah was injured as a result of defendant's attempted murder of Jordan.  See 
People v. Ephraim
, 323 Ill. App. 3d 1097, 753 N.E.2d 486 (2001).  This theory was amply supported by the State's evidence.  At trial, it was undisputed that the sawed-off shotgun wielded by defendant on October 13, 1999, was fired only once.  Testimonial evidence by police officers responding to the scene within minutes of the shooting corroborated Elijah's testimony that he was struck in the face by buckshot from the same blast that tore into Jordan's shoulder.  The hole in Elijah's face was consistent with pellets recovered from the scene.  Based on the evidence, the jury was justified in rejecting defendant's theory at trial that the hole was caused by poking Elijah with the barrel of the shotgun, and we will not speculate in this appeal that the hole was caused by debris on defendant's shoe.  The evidence was not so improbable or unsatisfactory as to leave a reasonable doubt as to defendant's guilt of the offenses committed against Elijah Dabney on a transferred intent theory.  Accordingly, defendant is not entitled to a reversal of his convictions.  See 
Ephraim
, 323 Ill. App. 3d 1097, 753 N.E.2d 486.

2.  Admissibility of Kathy Black's Testimony

Next, defendant claims that he was deprived of his right to present a defense when the court sustained the State's objection to Kathy Black's testimony.  He argues that the court erroneously ruled that the testimony was neither relevant nor admissible to impeach Elisha Dabney.

While it is true that a defendant has the right to present a defense (
People v. Manion
, 67 Ill. 2d 564, 367 N.E.2d 1313 (1977)), it is also true that the trial court is vested with broad discretion in ruling on the admissibility of evidence sought to be excluded as irrelevant.  
People v. Ward
, 101 Ill. 2d 443, 463 N.E.2d 696 (1984).  In assessing the trial court's exercise of discretion, we must determine whether the proffered testimony would have made the question of the defendant's guilt of the charged offenses more or less probable.  
Ward
, 101 Ill. 2d 443, 463 N.E.2d 696.  A court may properly refuse evidence as irrelevant if it is uncertain or remote in time.  
Ward
, 101 Ill. 2d 443, 463 N.E.2d 696. 

Kathy Black's proffered testimony related to a gun that Elisha allegedly wanted to sell to defendant two months before the shooting incident in this case.  She said the gun was long and had a cut handle and gray duct tape; it could have been a rifle.  Defendant sought to introduce the testimony in support of his theory that Elisha brought the same weapon to Brown's house on October 13, 1999, and drew it on defendant immediately before defendant grabbed the weapon and it fired.

The problem with defendant's offer of proof was that Black's testimony was both uncertain and remote.  It was undisputed that the weapon used in the offenses on October 13, 1999, was a sawed-off shotgun (not a long gun like a rifle) with the handle cut off and black tape (not gray duct tape) on the handle end.  Even assuming that Black was trying to describe the same weapon, her testimony about what happened in August 1999 was too remote to shed light on who brought the gun to Brown's house on the date of the offenses.  Accordingly, we cannot say that the trial judge abused her discretion in sustaining the State's relevancy objection.

Defendant argues in the alternative that the court should have admitted the testimony as impeachment of Elisha Dabney's testimony that he had never seen the shotgun or possessed it before October 13, 1999.  Again, we find no abuse of the court's discretion.  Generally, a cross-examiner may impeach a witness if a proper foundation for the impeachment is laid; however, he may not impeach a witness on collateral matters.  
People v. Collins
, 106 Ill. 2d 237, 478 N.E.2d 267 (1985).  A matter is collateral if it cannot be introduced for any purpose other than to contradict.  
People v. Hutson
, 223 Ill. App. 3d 50, 584 N.E.2d 975 (1991).

In this case, defendant failed to lay a foundation for Black's testimony during cross-examination of Elisha Dabney.  He never asked Elisha whether there was a gun in the car he sold to Black in August 1999.  Moreover, whether Elisha had a weapon in his possession in August was clearly collateral to the question of whether he had possession of the sawed-off shotgun used in the shooting of October 13.  Accordingly, we find no abuse of the court's discretion in denying admission of Black's testimony solely for impeachment purposes.  

As another alternative, defendant claims that his attorney provided ineffective assistance of counsel when she failed to lay a foundation to impeach Elisha.  This argument is not well taken. 

To establish ineffective assistance of trial counsel, the defendant must show both prejudice and deficient representation.  
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  Prejudice is shown if there is a reasonable probability that the result of the trial would have been different had counsel had not committed the errors complained of. 
Strickland
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

The evidence of defendant's guilt as presented in the State's case here was overwhelming.  Even if Black's testimony had been admitted, there is no reasonable probability that the jury would have found defendant not guilty of the charged offenses.  Accordingly, defendant is not entitled to a new trial on this ground.

3.  Closing Arguments

Last, defendant argues that he is entitled to a new trial because of numerous prejudicial comments made during the prosecutors' closing arguments.  He argues that the prosecutors improperly (1) placed the integrity of the office of the State's Attorney behind the credibility of its witnesses, (2) misstated the evidence, (3) accused defense counsel of attempting to manufacture reasonable doubt by confusing the jury, (4) appealed to the jury's passions and prejudices by repeatedly dubbing defendant a liar and imploring the jury to send him a message that his conduct would not be tolerated, and (5) commented on his criminal background.  Defendant contends that the comments, both individually and cumulatively, constituted plain error.

To preserve errors made in closing arguments, the defendant must raise an objection both at trial and in his posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988).  Where he fails to do so, the error is waived and will not be considered on review unless it rises to plain error (134 Ill. 2d R. 615(a)).  Plain error may be found where the evidence of guilt is closely balanced or where the alleged error was seriously prejudicial and prevented the defendant from receiving a fair trial.  
People v. Hudson
, 157 Ill. 2d 401, 626 N.E.2d 161 (1993). 

Defense counsel in this case filed a motion 
in
 
limine
 seeking to bar the State from making remarks that were found objectionable in various reported decisions in other cases; however, she failed to make contemporary objections during the State's closing arguments.  Without contemporaneous objections, the trial court had no opportunity to give cautionary instructions.  Therefore, the contentions of error based on the prosecutor's comments are deemed waived and will not be reviewed unless plain error resulted.  See 
Enoch
, 122 Ill. 2d 176, 522 N.E.2d 1124.   

As aforesaid, the evidence of defendant's guilt was not closely balanced.  We have reviewed defendant's arguments solely to determine whether the comments were so egregious as to have deprived defendant of a fair trial.  Having considered all of the allegedly improper comments individually and cumulatively, we cannot say that the prosecutor's remarks could have affected the jury's verdict.  Accordingly, the closing arguments will not be reviewed under the plain error doctrine.  

Although plain error did not result in this case, we nevertheless take this opportunity to caution prosecutors to refrain from making comments such as, "Send the defendant back to jail" and "Send him a message."  References to a defendant's residency at the county jail improperly imply that the defendant is a bad man deserving of punishment; and sending messages, whether to the defendant, to the police or to society, is not the jury's job.  It is wrong to imply that the guilty verdict form may be used for any purpose other than a finding that all elements of the offense were proved beyond a reasonable doubt.  We anticipate that savvy prosecutors will refrain henceforth from including "back to jail" and "message sending" comments in their closing arguments.

CONCLUSION

The judgment of the circuit court of Kankakee County is affirmed.

Affirmed. 

HOLDRIDGE, P.J., concurs. 

McDADE, P., concurs in part and dissents in part.

JUSTICE McDADE, concurring in part, dissenting in part

______________________________________________________________________________

I concur with the majority’s findings that (1) the evidence produced by the State was sufficient to prove defendant Kendrick Hayes guilty of the charged offenses beyond a reasonable doubt, and (2) the trial court’s decision to deny Karen Black’s testimony was not an abuse of discretion.  Despite this agreement, I would require that the defendant be retried because the statements made by the prosecutor were so improper that they constitute plain error that deprived him of a fair trial.  I dissent from the majority’s contrary decision.

I take this position for the following reasons.

Pursuant to supreme court rule 615(a) (134  ILCS R 615(a)), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."  We find "plain error" where there is an improper element in the trial and the evidence is closely balanced 
or
 when the claimed error was seriously prejudicial and precluded a fair trial for the defendant.  
People v. Hudson, 
157 Ill. 2d 401, 626 N.E.2d 161 (l993).  Where the statements of prosecutors are at issue, there is reversible error when it is impossible to say whether or not a verdict of guilty resulted from those statements.  
People v. Nieves, 
193 Ill. 2d 513, 739 N.E.2d 1277, 1286 (2000).  

The majority describes the evidence in this case as "overwhelming."  Apparently, the prosecutor did not see it that way; he found it necessary to either bolster closely balanced evidence or conceal insufficient evidence with totally improper rhetoric.  Even if the evidence had been overwhelming, that fact does not prevent a finding of plain error on the second prong of the test -- that the error was seriously prejudicial and prevented defendant from getting a fair trial.

In 
People v. Blue, 
189 Ill. 2d 99, 724 N.E.2d 920 (2000), the court noted: "‘A criminal defendant, whether guilty or innocent, is entitled to a fair, orderly, and impartial trial.’ conducted according to law."  
Blue,
189 Ill. 2d at 138, 724 N.E.2d at 941, quoting from 
People v. Bull, 
185 Ill. 2d 179, 214, 705 N.E.2d 824 (l998).  Citing Justice Ryan’s concurring opinion in 
People v. Green, 
74 Ill. 2d 444, 455, 386 N.E.2d 272 (1979), ("Even those guilty of the most heinous offenses are entitled to a fair trial."), the 
Blue 
court indicated that when the integrity of the judicial process is at risk, "the court will act on plain error 
regardless 
of the strength of the evidence of defendant’s guilt."  
Blue, 
189 Ill. 2d at 138-39, 724 N.E.2d at 941. (Emphasis in original.)

Admittedly, the conduct of the prosecutors in 
Blue
 and the subsequent cases 
People v. Johnson, 
208 Ill. 2d 53, 803 N.E.2d 405 (2003), was more blatant than that of the prosecutor in the case at bar.  Also, the charged crimes were more serious (actual murder versus attempt), and the sentences imposed were death rather than Kendrick Hayes’s 24 years.  The state and federal constitutions do not, however, extend the promise of a fair trial only in capital cases.  Criminal defendants are entitled to a fair trial regardless of the seriousness of the charged crime and regardless of their guilt or innocence.  
People v. Blue, 
189 Ill. 2d at 138, 724 N.E.2d at 940, citing 
People v. Bull, 
185 Ill. 2d at 214, U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2.

In my opinion, the prosecutor’s conduct in this case, while not as exaggerated as that in 
Blue, 
was every bit as inimical to the integrity of defendant’s trial and of the judicial process.  I think a fair analogy might be that a person killed by a .22 Beretta is just as dead as the one killed by an AK-47.

Inflammatory argument that seeks to forge an emotional unity of purpose between the prosecution and the jury creates a very real risk that jurors may give actual evidence only cursory consideration or none at all.  Such a bond compromises the defendant’s substantial right to a fair trial and threatens the integrity of the judicial process. 
 
In such a situation, it cannot be said with confidence that defendant’s trial was fundamentally fair, and the second prong of the plain error test is met.

While we cannot say for sure that the tactic was successful, it seems clear that the prosecutors in this case were attempting to subvert the jury’s role as neutral arbiter and to undermine the presumption of innocence by aligning the jurors with them as "the good guys" and characterizing the defendant as the "bad guy."  They began this effort by assuring them that the integrity of the State’s Attorney’s office stood behind the validity of the evidence and the credibility of the witnesses:

"Now, as prosecutors, Mr. Astrella and myself, as he said, we took an oath.  We took an oath to prosecute these cases.  We’re proud of what we do, and we take these very seriously.  To that end, we have brought the evidence in this case."

Not only were the prosecutors attempting to forge a bond with the jurors, they were also expressing a 
personal
 belief in the truthfulness and validity of the evidence they would be presenting.  This is wrong because "[t]he prosecutor’s opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government’s judgment rather than its own view of the evidence."  
Young, 
470 U.S. at 18-19, 84 L. Ed. 2d at14, 105 S. Ct. at1048 (1985).

Another statement that attempted to create unity with the jurors and dissuade them from looking objectively at testimonial inconsistencies and that also suggested a personal belief regarding defendant’s guilt came at the conclusion of the State’s rebuttal argument:

"Let’s let this bad man go 
because [our witnesses] had a few details wrong? 
 Is that what this county is about?  Or are we about sending people like this to jail?  That’s where he belongs.  Send him back to jail." (Emphasis added.)

The State is expressly discouraging the jurors from critically assessing conflicting testimony.  What would be serious misconduct under any circumstance seems particularly egregious given the fact that the State had produced no medical or forensic evidence to definitively substantiate a "reasonable inference" that one of the victims, Elijah Dabney, had been injured by buckshot. 

There were, as defendant has pointed out, other statements which expressed the prosecutors’ personal beliefs:

Acknowledging the jurors’ right to believe that defendant did not intend to kill Jordan and to find him guilty of only aggravated battery with a firearm, the prosecutor said:

"
We believe he’s guilty of both
. ***  But if for some reason you think his intent wasn’t to kill, find him guilty of aggravated battery of firearm, 
but we believe his intent was clear.
"  (Emphasis added.)

Another example of the alleged expressions by the prosecutors of personal belief regarding the evidence is:

"He’s lying.  He’s a convicted felon.  That affects his believability.  He’s been convicted of robbery.  You can look at that and say, I don’t believe him.  
I don’t believe him.  What he says doesn’t bear out, and he’s a convicted felon.  I don’t believe him."
  (Emphasis added.)

There may be some ambiguity in the printed version about precisely what the prosecutor meant – was he simply continuing to suggest what the jury might think to its collective self or was he really indicating his own belief? – but, given other expressions of the prosecutor’s beliefs, reasonable jurors could, and maybe would, take this statement as more of the same.

Such expressions of prosecutorial belief have drawn fire as improper from the supreme court.  See 
People v. Caballero, 
126 Ill. 2d 248, 533 N.E.2d 1089, 1097 (1989); 
People v. Whitlow, 
89 Ill. 2d 322, 433 N.E.2d 629 (l982); 
People v. Monroe, 
66 Ill. 2d 317, 362 N.E.2d 295 (1977).  

Defendant has made a creditable argument that there were alternative interpretations  construing the material that I have quoted as violations of other prohibitions and there were additional improper statements that I have not included here.  I believe the ones I have set out sufficiently establish both the existence of plain error and ample justification for remanding this case  for a new trial.

It seems clear to me that when the State arrogates to itself the role of witness/juror 
and 
backs up its conclusions and beliefs as to the proper outcome with the prestige of the prosecutor’s office 
and
 entices the jury into an alliance of the "good guys" against the defendant; there is prejudice not only to the defendant and but also to the judicial process.  This defendant’s right to a fair trial was seriously compromised.  A token gesture of our disapproval is simply insufficient.

The supreme court has made clear that its numerous exhortations and warnings over the years have fallen on deaf ears and have failed to deter conduct that it considers threatening to the judicial process.  See
, inter alia, People v. Moss,
 205 Ill. 2d 139, 792 N.E.2d 1217 (2001) ("This conclusion should not be interpreted in any way as condoning improper prosecutorial remarks that have become all too frequent in criminal trials. *** Although a new trial is not always a necessary sanction for improper remarks of a prosecutor, comments denigrating defendant’s witnesses must be strongly condemned."); Justice McMorrow, specially concurring ("..."I believe that the remarks made by the prosecutors during closing argument at defendant’s sentencing hearing must be strongly rebuked. ***   The prosecutorial remarks in this case were unprofessional and debased the sentencing proceeding *** I caution prosecutors not to make these comments again, and I urge judges to vigorously guard against such unprofessional conduct.").

 Justice Freeman, concurring in part and dissenting in part, joined by Justice Kilbride,  
undertook in 
Moss 
a lengthy analysis of why there should have been a finding of plain error.  

"Our past ‘messages’ appear to go unheeded as this case more than amply demonstrates.  I am further troubled by the fact that the court’s handling of this issue does nothing that would serve to diminish the likelihood of such conduct from recurring in our courtrooms.  In fact, I see quite the contrary: Today’s opinion reveals that this court  ***  (ii) will not, even in the face of conduct that is, by the court’s own admission, both ‘condemnable’ and ‘all too frequent in criminal trials’ attempt to discipline or even name those who engage in conduct that the court has prohibited.  Why then should any prosecutor re-adjust his or her argument to conform to our holdings when nothing happens to those who do not?  In light of these facts, I am more than confident that such conduct will be repeated in the future because there are simply no adverse consequences for those prosecutors whose behavior crosses the line, which is what happened in this case."  
Moss, 
205 Ill. 2d at 179-180, 792 N.E.2d at 1240.  

Citing the United States Supreme Court’s observation in a 1985 prosecutorial misconduct case that "the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; ‘the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct,’[citation]" 
(United States v. Young, 
470 U.S. at 18-19, 84 L. Ed. 2d at 14, 105 S. Ct. at 1048 1038, 1048 (l985)); Justice Freeman urged "trial judges to deal promptly with actions that serve to debase our criminal proceedings and jeopardize their fairness."  
Moss, 
205 Ill. 2d at 191-92, 792 N.E.2d at 1247.  Referring to the majority decision, he continued:

"Notwithstanding the court’s words of condemnation (citation omitted) nor the concurring justice’s reiteration of her strong disapproval of this type of courtroom behavior (citation omitted), my colleagues’ disposition of this issue will serve only to embolden and confuse the trial judges who have to deal with it.  This court cannot expect the trial judges to vigorously guard against improper conduct if we ourselves fail to address the problem with any consistency."  
Moss, 
205 Ill. 2d at 195, 792 N.E.2d at 1249. 

In the wake of 
Blue 
and 
Moss, 
the court took up the cases of three men alleged to have acted with Blue in the commission of the charged crimes.  
People v. Johnson, 
208 Ill. 2d 53, 803 N.E.2d 405 (2003).  In that case, Justice Rarick, writing for a unanimous court, noted that the disposition in 
Johnson 
"requires that we further delineate the dimensions of 
Blue
, applying the principles and standards of review utilized in that case."  
Johnson, 
208 Ill. 2d at 60, 803 N.E.2d at 410.  He observed that: "Indeed, concern over the cumulative effect of errors that ‘created a pervasive pattern of unfair prejudice,’ much of it attributable to misconduct of the prosecutors, is what drove this court’s analysis in 
Blue." 
and stated that "
Blue
 represents an important step this court has taken to stem prosecutorial misconduct, a problem that courts across the country have, for the most part, been unable or unwilling to control (citation omitted)." 
Johnson, 
208 Ill. 2d at 64-65, 803 N.E.2d at 412.

In analyzing this problem, Justice Rarick quoted (
Johnson, 
209 Ill. 2d at 65-66, 803 N.E.2d at 412-13) from a case decided by a federal district court in New York:

"This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here.  But, each time it has said that, nevertheless, it would not reverse.  Such an attitude of helpless piety is, I think, undesirable.  It means actual condonation of counsel’s alleged offense, coupled with verbal disapprobation.  If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it.  For otherwise it will be as if we declared in effect, ‘Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. *** The practice of this court – recalling the bitter tear shed by the Walrus as he ate the oysters – breeds a deplorably cynical attitude towards the judiciary."  
United States v. Antonelli Fireworks Co., 
155 F.2d 631, 661 (l946)

The fact that the quote was authored 58 years ago by Judge Jerome Frank serves to emphasize that courts have been unsuccessful over a period of many years in dealing with this frustrating problem.

The 
Johnson 
court concluded its framing of the context in which the issues would be viewed as follows:

"The 
Moss 
dissent also conveys a sense of exasperation with the ‘helpless piety’ that afflicts our judiciary.  In 
Moss, 
our distinguished colleagues in dissent observed that threats of reversal, and words of condemnation and disapproval, have been less than effective in curbing prosecutorial misconduct and are unlikely to achieve any greater success in the future: [quotation omitted].

"Within this milieu, and against the precedential backdrop of 
Blue, 
we now turn our attention to the facts of these consolidated cases."  
Johnson, 
208 Ill. 2d at 66-67, 803 N.E.2d at 413.

Finally, after completing the analysis of all three cases individually, finding that two of the convictions had been properly reversed and remanding the third case for consideration of the defendant’s claim of ineffective assistance, Justice Rarick offered the following word of caution:

"We note that our decision in 
Blue
 does not furnish a license to courts of review to adopt a cursory or skeletal analysis of the facts and issues before them.  It 
does
 signal our intolerance of pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant’s guilt or innocence."

Johnson, 
208 Ill. 2d at 117, 803 N.E.2d at 442.

It is my belief that we have such deliberate undermining in this case.

Again, I emphasize that we do not deal here (or ever) with a capital case.  Nevertheless, I believe that depriving a person not proven guilty beyond a reasonable doubt of liberty for even a minimal term is just as much as miscarriage of justice as sentencing such a person to death and must be guarded against with great care.  
We
 are called upon to provide guidance and direction to trial judges, prosecutors, and defense counsel regarding conduct in "lesser" criminal cases which may impair the right of the defendant to receive a fair trial.  I do not believe we satisfy that responsibility when we 
"anticipate that savvy prosecutors" will respond favorably to our "disapproval of the foregoing remarks" (even though, for decades, prosecutors have ignored similar disapproval from the supreme courts of our state and of the United States) and decline to send this case back so it can be done right.  I cannot agree with that decision and respectfully dissent.