NOTICE
Decision filed 07/15/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230516-U

NO. 5-23-0516

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-329 |
| | ) | |
| LANELL J. METCALFE, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Boie* concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's conviction for predatory criminal sexual assault of a child is affirmed where the evidence overwhelmingly supported the jury's guilty verdict and where the State's witness's reference to and the State's closing argument regarding, the defendant's jail status, were not plain error and did not support a claim of ineffective assistance of counsel.

¶ 2    Lanell Metcalfe was convicted of predatory criminal sexual assault of a child and sentenced to 25 years in the Illinois Department of Corrections (IDOC). He argues on appeal that the evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt, and that references to his jail status amounted to plain error, requiring a new trial. For the following reasons, we affirm the defendant's conviction and sentence.

_____

*Justice Welch participated in oral argument. Justice Boie was later substituted on the panel and has read the briefs and listened to the recording of oral argument

1

¶ 3                                    I. Background

¶ 4    On March 24, 2021, the defendant was charged with one count of aggravated criminal sexual abuse in violation of section 11-1.60(c)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.60(c)(1) (West 2020)) and one count of predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Code (*id.* § 11-1.40(a)(1)). The matter proceeded to a jury trial only on the predatory criminal sexual assault of a child count on January 30, 2023. The minor child, M.J., who was 15 years old at the time of trial, testified first. On December 23, 2019, she lived in a house in Champaign with her mother (Jasmine), the defendant, and her four siblings. She and three of her siblings (one sister and two brothers) have the same father, who is not the defendant. The youngest sibling's father is the defendant, who had been residing with them for approximately two years.

¶ 5    On that date, M.J. was sleeping in her room, which she shared with her sister. The defendant awoke M.J. a little after midnight and asked if she wanted to go to the store, to which she replied, "no." The defendant left her room, and M.J. got up, went to the living room, and sat with her mother, Jasmine, who was asleep on the couch. M.J. then returned to her room and laid beside her sister. She fell asleep wearing underwear, a bra, a T-shirt, and shorts. The next thing she remembered was waking up with the defendant, who was on top of her, being pulled off of her by her mother. She noticed that she was on her stomach and that her underwear and shorts, which had been at her waist when she fell asleep, had been pulled down to her knees. When the defendant was being pulled off of her, she saw that his shorts were down at his knees, but she did not see his penis. The defendant and her mother wrestled on the ground. While her bedroom had no lights on, she had a curtain in the doorway which allowed some light through. M.J. was able to see it was the defendant by his dreadlocks. Jasmine called the police and took M.J. to the emergency room.

M.J. never saw the defendant again.

¶ 6　Jasmine testified that she had five children. The defendant was the father of her youngest, who was now three years old. The defendant had resided with her for almost two years. On the night in question, Jasmine had fallen asleep on the couch with her youngest child, who was only a few months old. At some point, she woke up because all the house lights were on. She got up to turn them off. She did not turn off the bathroom light because she left that on for her youngest daughter. She walked into M.J.'s room and saw the defendant on top of M.J. Both of them had their pants down. M.J. was on her stomach, her shorts were pulled down to her knees, and Jasmine could see M.J.'s bare buttocks. The defendant was on his knees, leaning over M.J., touching her. She screamed his name and pulled the defendant off of M.J. The defendant said, "Baby, I'm sorry." They wrestled for a bit, and then he ran out the back door. She ran to her room, called the police, and took M.J. to the emergency room.

¶ 7　Upon her return from the hospital, Jasmine noticed that her front door had been broken and that the defendant's coat, shoes, and pants were missing. When the defendant initially fled, he left his cell phone and wallet. Jasmine had not seen the defendant since that night, and he had not reached out to her in any way.

¶ 8　On cross-examination, Jasmine said that it was common for the defendant to play video games or watch movies in M.J.'s room. She indicated that she owned a handgun, and after she pulled the defendant off of M.J., she ran to her room to retrieve it. The defendant was aware that she owned a gun, and she had told him that night that he was going to die. On redirect examination, Jasmine testified that when she went into M.J.'s room, she did not see the defendant's penis. She did see saw his buttocks.

¶ 9　Rebecca Powers, a registered nurse employed by Carle Foundation Emergency

3

Department, testified that she performed a sexual assault examination on M.J. This examination involved collecting M.J.'s clothing, which included a pair of black shorts, her blue shirt, and her bra and underwear. After collecting the clothing, Powers did a physical exam and found no external injuries. After the exam, M.J. then told Powers that during that night, the defendant came into her room several times. The first time, he woke her up and asked if she was okay, to which she said "yes" and fell back asleep. The second time, he asked her if she wanted to go to the store to get some snacks, to which she said "no." Another time, he pulled on her leg, retrieved a movie, and then left. He came into her room a fourth time and pulled on her leg. She questioned him, which made him angry. He frowned, sighed heavily, and left. M.J. did not tell Powers anything about the assault. Powers obtained a vaginal swab from in between M.J.'s labia, an anal swab from her circumference of her anus, and oral swabs for DNA analysis.

¶ 10 On cross-examination, defense counsel elicited additional testimony from Powers regarding information that M.J. had reported to her during the questioning of what events had transpired. Powers testified that M.J. indicated she had gone to the bathroom that night and, at one point, had taken out her laptop to listen to music. Powers also elaborated on her findings during the sexual assault examination. She indicated that during M.J.'s physical exam, Powers noted on her medical record, that there was either tenderness, abrasion, swelling, or redness in the anal area. Powers did not recall, however, which of those four injuries were present on M.J. at the time of the examination.

¶ 11 Amy Petrilli testified that she was a detective with the Champaign Police Department and had received specialized training in child sex crimes. Detective Petrilli submitted M.J.'s underwear and clothing, along with the swabs taken at the hospital to the Illinois State Crime Lab. Detective Petrilli also was present in a separate room to observe the interview of M.J. by the Child Advocacy

4

Center (CAC). Between December 2019 and March 2021, Detective Petrilli stayed in touch with Jasmine in the hopes of locating the defendant. After the defendant was arrested, Detective Petrilli testified, "I met with [the defendant] at the satellite jail to collect his DNA." The DNA sample was submitted to the Illinois Crime Laboratory. A stipulation was then read to the jury. The stipulation indicated that Svetlana Gershburg, a forensic scientist in DNA analysis, had examined the clothing obtained from M.J., which included "a bra, underwear, shirt and shorts." The stipulation further indicated that if called to testify, Gershburg would state that her forensic analysis revealed that no semen was detected on M.J.'s underwear or her shirt. Her shorts were not tested.

¶ 12    Dana Pitchford testified that she was employed by the Illinois State Police Forensic Science Laboratory as a scientist specializing in forensic biology and DNA analysis. She explained that her job responsibilities included taking known DNA swabs to make comparisons with DNA found on other items. In this case, with regard to the vaginal swabs, she was able to detect male DNA, but it was such a small amount as compared to the female DNA present that she was unable to profile it. The anal swab had a smaller amount of female DNA present, so she was able to obtain a male DNA profile from 3 different locations out of the 23 possible locations on the DNA strand.

¶ 13    Dexter McElhiney testified that he was a forensic scientist with the Illinois State Police crime laboratory, specializing in biology and DNA analysis. McElhiney made DNA comparisons from swabs taken off the clothing collected from M.J. Concerning the DNA collected on the outside of the bra, McElhiney found there was a mixture of at least three people, one being M.J. and the other two inconclusive. The outside of the underwear contained a mixture of three people's DNA: one being M.J., the second a male, and the third inconclusive. Further testing revealed that the defendant could be included as the contributor of the male DNA with a statistical frequency of 1 in 450 quintillion. McElhiney testified that there was a lot of male DNA on the underwear and

5

bra and that both had to have occurred via primary transfer of some bodily fluid to account for such a large amount. With regard the anal swab, he found three locations that matched the defendant with a statistical value of 1 in 70 unrelated individuals.

¶ 14    On cross-examination, McElhiney testified that as to the outside of the bra and the underwear, he did not receive any other DNA samples for comparison besides those from M.J. and the defendant. Further, because there were only three loci found in the anal sample, McElhiney could only say that the defendant was included as a donor and could not say that it was the defendant's DNA. As to the underwear, McElhiney opined that the defendant "[came] in contact" with the underwear but could not make any findings as to when the underwear was touched by the defendant.

¶ 15    On redirect examination, McElhiney testified that even though DNA remained on clothing after it had been through a washing machine, the DNA would decrease in amount. He opined that there was too much DNA on the clothing for it to have been there after going through the washing machine.

¶ 16    Mary Tewell testified that she was employed by the Champaign County Children's Advocacy Center (CAC) and interviewed M.J. on December 30, 2019. A redacted version of the interview video recording was admitted into evidence and published to the jury. In the interview, M.J. told Tewell that the defendant came into her room on the night at issue, woke her up, and asked if she wanted to go to the store with him. He got mad because she did not want to go. She got up, went to the living room where her mother was, and saw that her mother was asleep. She said he kept coming into her room and shaking her, trying to wake her up. She got scared, so she crawled into bed with her sister. The next time she woke up, she was in her bed, which worried her because that meant someone moved her to her bed. She turned on her TV and computer and

6

listened to music to help her go back to sleep because she was scared. The next time she woke up, everything was turned off, and the defendant was standing at the door. Even though all the lights in the house were off, and it was pitch black, she could tell it was the defendant by his dreadlocks. He asked her again if she wanted to go to the store. He came to the end of her bed and started rubbing her foot. She kicked his leg and hand, and he left. She then put on some shorts because it was hot in the house.

¶ 17     The defendant came back into M.J.'s room, and when she got up and went to the bathroom, he looked at her and smiled. She went to her mother who was asleep in the living room and stayed there for about 20 minutes. She went back to her room and fell asleep. The defendant came into her room and got some movies. She fell asleep and had a nightmare about him touching her all over, and she screamed, which woke her up. He was still in there and asked her if she was okay. She said "yes" and asked him to leave. She fell asleep, and the next time she woke up, her pants were down. Her mother entered her room, jumped on the defendant, and they wrestled. She did not know if it was a dream or if something had actually happened. She did not like lying on her stomach, but that was how she woke up. M.J. recalled the defendant's belongings being on her bedroom floor. The defendant was wearing black shorts, and her neck was wet.

¶ 18     At the conclusion of the video evidence, the State rested. Defense counsel made a motion for a directed verdict, which was denied. The circuit court was advised that the defendant intended to testify, and the defendant was duly admonished of his rights outside of the presence of the jury. The defendant indicated he wanted to testify on his own behalf.

¶ 19     The defendant then testified that he had been residing with Jasmine and her children on December 23, 2019. He sometimes helped with laundry, cooking, and getting the children from school. At that time, he had just started working the day shift at Kraft. He had a good relationship

with the children and played video games with them. The PlayStation was in M.J.'s room, and most of the time, they watched movies in her room. He was frequently in M.J.'s room playing games or watching television, and all of the children would be in there.

¶ 20    The defendant denied going into M.J.'s room to ask her to go to the store. Generally, he would take the children to the store but never that late at night. He did not know why his coat and shoes were on the floor in M.J.'s room, as it was not someplace that he would have generally left them. He was in her room earlier that evening because they had been playing video games and then watched a movie. He did not recall going into the room to wake M.J. up. He fell asleep on the end of M.J.'s bed that night, woke up later, and realized the movie was over. As he was leaning over to see if the children were asleep, Jasmine walked in and started tussling with him, asking what he was doing. He testified that his shorts and underwear were pulled up to his waist and that he did not pull down M.J.'s shorts. He stated that he did not touch M.J. with his hands or his penis.

¶ 21    The defendant indicated that Jasmine told him she was going to kill him and ran to her room, where he knew she kept a gun, and he was afraid she was going to shoot him. The defendant did not try to explain to Jasmine what was going on because he knew she had a gun. He returned later to retrieve some of his belongings. The defendant had no contact with Jasmine after that night, although some of his family members had been in contact. He had not seen his child since December 2019, because his family members advised him to let things cool down. Further, he feared for himself because his family members had received phone calls threatening his life. On cross-examination, the defendant explained that his DNA appeared on M.J.'s anal swab because "I lived there over a year. I'm pretty sure the way DNA is, I have DNA all over the house, and we washed our clothes together." The defendant testified that this was the first time that Jasmine had ever threatened him with the gun. He repeatedly denied touching M.J. or pulling her pants down.

8

¶ 22    The jury convicted the defendant of predatory criminal sexual assault of a child. Subsequently, the defendant's request to proceed *pro se* was granted. The defendant filed several posttrial motions, which were denied. After a sentencing hearing the defendant received 25 years in IDOC. The defendant's motion to reconsider the sentence was denied, after which he timely filed this appeal.

¶ 23                                                    II. Analysis

¶ 24    The defendant first argues that the State failed to prove any contact with the defendant's penis and M.J.'s body. He contends that neither Jasmine nor M.J. saw his penis, that the forensic evidence failed to establish the presence of semen on any of M.J.'s clothes, and that the DNA evidence including him as a possible DNA contributor to the anal swab was weak. He asserts that, just because M.J. and Jasmine both testified that they saw his shorts down "does not create a reasonable inference that [he] touched M.J.'s buttocks with his penis."

¶ 25    The defendant points out that Jasmine was impeached during trial and that M.J.'s testimony was inconsistent. As to the defendant's DNA found on the outside of M.J.'s underwear, the defendant contends that it does not confirm that he touched M.J.'s buttocks and theorizes that his DNA was transferred by doing common laundry. The defendant next argues that a new trial is required because the State both elicited witness testimony and argued in closing that the defendant was in custody, thus causing prejudice. He maintains that the testimony and closing argument prejudiced him "where the evidence in his case was so closely balanced that they tipped the scales of justice in the State's favor."

¶ 26    The defendant concedes that while this issue was not preserved, we can review this claim because "the prosecutor's misconduct amounted to plain error." He also asserts that this issue can

9

be reviewed because defense counsel's failure to object constituted ineffective assistance of counsel.

¶ 27    In response, the State points out that the defendant does not dispute that his age and M.J.'s age met the requirements of the predatory criminal sexual assault of a child statute and does not challenge that the intent to sexually gratify or arouse element was established by circumstantial evidence, including his conduct. Thus, the defendant's argument on appeal is limited to the sufficiency of the proof of an act of contact. The State maintains that there was testimony that the defendant's and M.J.'s shorts were pulled down to their knees and that Jasmine saw the defendant on his knees, leaning over M.J. The State argues that "[f]rom this position, defendant's penis was physically capable of touching the victim's buttocks. The jury properly considered the totality of the circumstances, including the physical position of the victim and defendant."

¶ 28    The State argues that neither Jasmine nor M.J. were required to testify that they saw the defendant's penis in order for the jury to find statutorily required contact with M.J.'s buttocks based upon circumstantial evidence. The State further asserts that the inconsistencies between M.J.'s trial testimony and her statements during the CAC interview were minor, and it was the jury's role to assess her credibility.

¶ 29    Regarding the DNA evidence, the State points out that the anal swab was from inside the anus and not the outside and that the defendant was not excluded as a contributor. It contends that McElhiney opined that the transfer of male DNA was from blood, saliva, or semen and was so large that it could not be accounted for by a "common load of laundry." The State further contends that the defendant's argument that the DNA was not linked to him is unavailing, because this is not a case of identity, since defendant was the only male on top of M.J. The State concludes "[w]hen a defendant challenges the sufficiency of the evidence to support his conviction, this Court

10

considers the evidence in its totality, and considers all reasonable inferences form the record in the light most favorable to the People—not in the light most favorable to the Defendant."

¶ 30    Second, the State argues that the references to the defendant's jailed status did not constitute plain error or support a claim of ineffective assistance of counsel. The State notes that defense counsel failed to object during the testimony of the State's witness and the prosecutor's closing argument, and thus, these claims are forfeited. The State further contends that the defendant cannot revive his claims under the plain-error doctrine, because mentioning the defendant's jail status was not a clear or obvious error and did not affect the fairness of his trial. Further, defense counsel's failure to object did not amount to ineffective assistance of counsel because the defendant failed to show that the references to his incarceration caused him any prejudice.

¶ 31    In reply, the defendant argues that M.J.'s and Jasmine's testimony was "repeatedly and consistently impeached" and, therefore, insufficient to support a finding of guilt. He also asserts that he never argued that he was not in M.J.'s bedroom; instead, the issue was whether the defendant's penis touched M.J.'s buttocks. The DNA evidence, then, was not used to determine if he was in her bedroom, but whether there was contact between the defendant and M.J. The defendant further maintains that the references to his incarceration were substantially prejudicial since this case hinged on witness credibility.

¶ 32    "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When a defendant challenges a conviction based on insufficient evidence, we, while considering all of the evidence in the light most favorable to the prosecution, must determine whether the jury could have found the essential

11

elements of the crime beyond a reasonable doubt. *Id.* "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* (quoting *Jackson*, 443 U.S. at 319). We will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* "[A] criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 33　The defendant was convicted of predatory criminal sexual assault of a child pursuant to section 11-1.40(a)(1) of the Code (720 ILCS 5/11-1.40(a)(1) (West 2020)), which states:

> "A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and *** the victim is under 13 years of age[.]"

¶ 34　The crux of the defendant's argument is that he did not commit an act of contact with M.J. "[A]n element of predatory criminal sexual assault of a child is that there be skin-to-skin contact." *People v. Currie*, 2023 IL App (2d) 220114, ¶ 42. Further, the statute allows the contact to be "however slight." 720 ILCS 5/11-1.40(a)(1) (West 2020). Since there is no direct proof of skin-to-skin contact between M.J. and the defendant, the jury had to rely on circumstantial evidence. "A criminal conviction may be based on circumstantial evidence, as long as it satisfies proof beyond a reasonable doubt of the charged offense." *People v. Duran*, 2011 IL App (2d) 100470-U, ¶ 14 (citing *People v. Hall*, 194 Ill. 2d 305, 330 (2000)). When a case is based on circumstantial evidence, the jury does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if all the evidence considered as a whole satisfies the jury that beyond a

12

reasonable doubt, the defendant is guilty. *Id*. The testimony from M.J. and Jasmine and the DNA findings support the conclusion of skin-to-skin contact between M.J. and the defendant.

¶ 35    First, both M.J. and Jasmine testified that when Jasmine pulled the defendant off of M.J., the defendant's shorts and M.J.'s shorts had been pulled down to their knees. Further, M.J. testified that when she woke, as her mother was pulling the defendant off of her, she noticed that she was on her stomach. She testified that she did not like sleeping on her stomach and that, when she fell asleep, her shorts and underwear had been up at her waist. Jasmine testified that she saw the defendant leaning over M.J., as this was her point of view from her position in the doorway of the room. It was reasonable for the jury to infer that the defendant, with his pants pulled down to his knees, leaning over a young girl on her stomach, with her pants and underwear also pulled down to her knees, made the statutorily required contact with M.J.'s buttocks.

¶ 36    Additionally, the defendant's actions immediately after being discovered provide further support for an inference of guilt. After being caught in the act by Jasmine, the defendant ran out of the house, never to be seen until he was arrested and placed in custody, which was many months after the incident. The defendant's flight and prolonged absence lends support to the conclusion that his actions were not susceptible to an innocent explanation.

¶ 37    Moreover, the DNA evidence corroborates skin-to-skin contact. Male DNA was located on the swab taken from the circumference of M.J.'s anus, and the defendant was not excluded as a contributor to this DNA. The DNA was not used to identify M.J.'s perpetrator; instead, it was used to determine if contact had occurred. The defendant has not denied the existence of male DNA in M.J.'s anus, nor has he provided any other plausible source for the presence of male DNA. Additionally, testimony indicated that the large amount of the defendant's DNA that was located

13

on M.J.'s underwear was deposited by blood, saliva, or semen and not by secondary contact such as mixing laundry.

¶ 38    The defendant argues that M.J. was inconsistent in her account, and therefore, her testimony is unreliable, thus casting doubt on the defendant's guilt. First, any inconsistencies were minor. Second, it was the province of the jury to weigh any such inconsistencies. "The trier of fact must assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters." *Duran*, 2011 IL App (2d) 100470-U, ¶ 13 (citing *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001)). The evidence overwhelmingly supports the jury's finding of guilt. Having reviewed the entire record, we cannot find that the evidence was so unreasonable, improbable, or unsatisfactory as to cast reasonable doubt on the defendant's guilt.

¶ 39    Next, the defendant concedes that he failed to object to the State's references to his custodial status but argues that this issue can be reviewed as plain error or, alternatively, ineffective assistance of counsel. " '[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *In re N.H.*, 2016 IL App (1st) 152504, ¶ 75 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The defendant bears the burden of persuasion under both prongs. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). We must first determine whether any error occurred, because if not, there can be no plain error. See *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

Detective Petrilli testified that after the incident, the whereabouts of the defendant were unknown for a long period of time. She testified about the steps taken to locate the defendant. She was asked whether, at some point, the defendant was taken into custody, to which she responded in the affirmative. Detective Petrilli then made an in-court identification of the defendant and said, "I met with [the defendant] at the satellite jail to collect his DNA."

¶ 40    The defendant argues that the statement by Detective Petrilli was plain error. We disagree. Detective Petrilli's statement was made in response to a question from the State about why she met with the defendant in August 2022. The purpose of her testimony was to inform the jury that she was the one who obtained the defendant's DNA sample and to explain the process of doing so. The State did not elicit the reference to the jail specifically, as it was not asking where she met with the defendant. Further, the State quickly moved on to the DNA sampling, taking the focus away from the comment about meeting the defendant in jail.

¶ 41    The next reference to the defendant's incarceration occurred during closing argument, where the State argued:

> "DNA is a small part of the puzzle. It's not the entire puzzle. Remember that this defendant was already in jail before the detective got his DNA standard. This case wasn't built on the DNA. It just is a building block to prove his guilt."

¶ 42    This mention of incarceration addressed the defendant's position that the DNA evidence was not conclusive enough to be considered as evidence against him. In response, the State argued to the jury that the evidence against the defendant was strong enough without the DNA evidence. In other words, the State believed it had sufficient evidence to arrest the defendant even without the defendant's DNA comparison to the evidence found on M.J.'s underwear and bra.

¶ 43    Later in its argument, the State said, again without objection by defense counsel:

> "He's been in custody since at least August. You heard that Detective Petrilli went and saw him at the jail to take his DNA. He's in jail. Nobody in [M.J.] and Jasmine's family can

get to him and kill him in the jail. Why doesn't he make a phone call when he's in jail? How's my son doing? He doesn't want to have that conversation, because he doesn't want to face the mother of the daughter that he sexually assaulted."

¶ 44 This statement was in response to the defendant's testimony that he had not contacted Jasmine since the night in question because he was in fear for his life based on threats that had been made against him. The State's remarks during closing were to rebut the defendant's argument that he was scared, since obviously he could not be harmed by the victim's family while incarcerated. The State was arguing that the defendant's failure to contact Jasmine after the incident was not because he was scared, but because he had sexually assaulted her daughter.

¶ 45 "When reviewing challenges to a prosecutor's remarks made during closing argument, the challenged remarks must be viewed in the context of closing argument as a whole." *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 35 (citing *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 51). A prosecutor has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant. See *People v. Williams*, 2022 IL 126918, ¶ 44. The prosecution in closing argument may comment on the credibility of the witnesses. See *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 33. Such comments should be considered in the context of the entire closing argument, as well as the trial court's instructions that arguments are not evidence and that the prosecutor bears the burden of proving the defendant's guilt beyond a reasonable doubt. *Id.* When analyzing the "jail" references in relation to the entire closing argument, it is apparent that they were not made to inform the jury that the defendant was incarcerated or that he was a bad person. Rather, the references were made to rebut the defendant's testimony that he was scared, and in response to the defendant's testimony about alleged death threats.

16

¶ 46  The defendant cites *People v. Hayes*, 353 Ill. App. 3d 578, 586 (2004), to support his argument that the references to being incarcerated were plain error. In *Hayes*, the court "caution[ed] prosecutors to refrain from making comments such as, 'Send the defendant back to jail.' " *Id.* It was explained that "[r]eferences to a defendant's residency at the county jail improperly imply that the defendant is a bad man deserving of punishment." *Id.* Here, however, the prosecutor did not ask the jury to send the defendant back to jail or draw undue attention to the fact that the defendant was currently incarcerated. One witness made a passing reference to the defendant's incarceration in response to a question, and the remaining comments were made in closing argument directed against the defendant's testimony. We find that the references to incarceration were minor and did not constitute clear and obvious errors. As a result, the defendant's contention does not warrant plain-error review.

¶ 47  The defendant argues that it was ineffective for his attorney not to object to the references of his incarceration. Claims of ineffective assistance are governed by the standard outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 24. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Cathey*, 2012 IL 111746, ¶ 24. Neither prong is met here.

¶ 48  The defendant's argument that his counsel was ineffective requires us to find that he would have been acquitted had trial counsel objected to the references of his incarceration. He contends that the jury's verdict hinged on the knowledge of his incarceration. We disagree. The evidence

17

against the defendant was overwhelming. It is pure speculation that had defense counsel objected to the references of his incarceration that the objection would have been sustained, and the comments about his incarceration would have been stricken or never made, resulting in an acquittal. " '*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice.' " *People v. Parker*, 2014 IL App (5th) 120151-U, ¶ 16 (quoting *People v. Bew*, 228 Ill. 2d 122, 135 (2008)). Accordingly, the defendant's claim of ineffective assistance of counsel fails.

¶ 49 The defendant's final argument is that his sentence for predatory criminal sexual assault of a child violated the proportionate penalties clause of the Illinois Constitution. This claim has been rendered moot by the Illinois Supreme Court's recent ruling in *People v. Johanson*, 2024 IL 129425, where the court found that predatory criminal sexual assault of a child and aggravated criminal sexual abuse do not contain identical elements, and, therefore, the offense of the former does not violate the proportionate penalties clause. An issue "on appeal becomes moot, when ' "the issues involved in the trial court no longer exist," ' and it is 'impossible for the appellate court to grant the complaining party effectual relief.' " *American Service Insurance Co. v. City of Chicago*, 404 Ill. App. 3d 769, 781 (2010) (quoting *In re A Minor*, 127 Ill. 2d 247, 255 (1989), quoting and citing *La Salle National Bank v. City of Chicago*, 3 Ill. 2d 375, 378-79, 380 (1954)). Accordingly, we need not address this argument.

¶ 50                                    III. Conclusion

¶ 51 Considering all of the evidence in the light most favorable to the State, we find that the evidence was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. Further, we find that the references to the defendant's jail status did not constitute error or support a claim of ineffective assistance of counsel. For the foregoing reasons, we affirm the defendant's conviction and sentence.

18

¶ 52    Affirmed.